AMHERST-PELHAM REGIONAL SCHOOL COMMITTEE *vs.*
DEPARTMENT OF EDUCATION.

Hampshire. April 5, 1978. — September 28, 1978.

Present: HENNESSEY, C.J., BRAUCHER, KAPLAN, WILKINS, & LIACOS, JJ.

*Education,* Special educational needs. *School and School Committee,*
Special educational needs, Reimbursement for special educational
expenses. *Administrative Agency,* Regulation, Decision, Time of
decision.

Under the provisions of G. L. c. 71B, § 3, once the Bureau of Child
Advocacy had found a school committee's proposal inadequate to
meet the special educational needs of a child, it had the authority
to recommend a specific alternative placement for the child without
any further school committee participation in the decision. [486-
491]
Where the Bureau of Child Advocacy determined that a program
proposed by a school committee to meet the special educational
needs of a child and rejected by the parents was inadequate, and
where pending their appeal the parents had enrolled the child in
a private institution which the bureau determined to have been
appropriate, the Department of Education had the authority under
St. 1972, c. 766, to order retroactive reimbursement to the parents
for the costs incurred at the private institution. [491-494]
General Laws c. 44, § 31, barring municipal departments from incur-
ring liabilities for which there are no appropriations, did not pro-
hibit a school committee from paying for special educational serv-
ices in accordance with an order of the Bureau of Child Advocacy.
[494-496]
The failure of the Bureau of Child Advocacy to issue a decision within
thirty days after a hearing, as required by its regulations, did not
invalidate its decision where the parties were not prejudiced by the
delay. [496-498]

CIVIL ACTION commenced in the Superior Court on October 7, 1975.

The case was reported to the Appeals Court by *Moriarty, J.* The Supreme Judicial Court granted a request for direct review.

*Marguerite M. Dolan* for the plaintiff.

*Terry Jean Seligmann,* Assistant Attorney General (*S. Stephen Rosenfeld,* Assistant Attorney General, with her) for the defendant.

*C. Peter R. Gossels,* for the town of Franklin & another, amici curiae, submitted a brief.

*Jeffrey F. Jones,* for the School Committee of Lexington & others, amici curiae, submitted a brief.

*David C. Trott & Lawrence Kotin* for the Federation for Children with Special Needs, Inc., amicus curiae, submitted a brief.

HENNESSEY, C.J. On October 7, 1975, the Amherst-Pelham Regional School Committee (school committee) instituted an action in the Superior Court seeking judicial review both of a decision rendered by the Bureau of Child Advocacy (bureau)[1] and a ruling issued by the Department of Education (department) pertaining to that decision. The decision and ruling at issue concern the nature and scope of special educational services to be provided under c. 766 of the Acts of 1972[2] (c. 766) to a child with special educational needs.

On this question, a bureau hearing officer had determined that (1) an educational plan prepared by the school committee pursuant to its responsibilities under c. 766 was inadequate, and (2) the private residential program proposed by the parents was appropriate. Subsequent to this decision, the project director of special education had notified the school committee that it was responsible for

---

[1] This agency, now known as the Bureau of Special Education Appeals, is a bureau within the Division of Special Education of the Department of Education. See G. L. c. 15, § 1N.

[2] G. L. c. 71B.

the cost of private placement after the parents had reject-
ed the school committee's proposed educational plan.

After reviewing the record of the proceedings, the
judge concluded that the bureau's findings were support-
ed by substantial evidence. He further decided that the
procedure followed in rendering the bureau's decision,
although irregular, did not constitute grounds for quash-
ing the decision. The judge reported the case to the Ap-
peals Court, however, on three questions of law concern-
ing both the role of the school committee and the nature
of the bureau's authority in implementing the provisions
of c. 766. We granted direct appellate review.

The questions reported for our determination are:
"(1). Is the ... Department of Education authorized to
order the placement of a child with special needs in a
specific private residential institution without first af-
fording the school committee ... an opportunity to recom-
mend an institution for such placement, where either the
Bureau ... or the State Advisory Commission on Special
Education [SAC] has determined that a program pro-
posed for such child by ... the school committee is inade-
quate and that the program offered by the private institu-
tion is appropriate for the needs of the child?

"(2). Where either the Bureau or the [SAC] has deter-
mined ... that a program proposed ... by the school com-
mittee ... and rejected by the parents ... is inadequate,
and where the parents ... have, pending their appeal to
the said Bureau or the [SAC], enrolled the child in a
private institution which the said Bureau or the ... [SAC]
determines to have been appropriate, is the Department
... authorized to order retroactive reimbursement to the
parents by the [city, town or district], of all or part of the
costs incurred ... for instruction and support of the child
at the private institution"; and, "(3) if so, to what date
may such reimbursement be made retroactive?"

In addition, the school committee seeks appellate re-
view of the judge's rulings with respect to agency proce-
dure.

For the reasons discussed below, we answer the first two reported questions in the affirmative. As to the third question, we conclude that retroactive reimbursement to parents who have provided necessary services at their own expense, from the date at which they rejected the school committee's inadequate plan, is consistent with the statutory scheme.

Finally, we note that the procedural issues raised by the school committee are interlocutory in nature, and not properly before this court for review. See *Reynolds* v. *Missouri, Kan. & Tex. Ry.*, 224 Mass. 379, 388 (1916). As the issues were briefed by both parties, however, we have reviewed the procedural claims and have found them to be without merit.

We summarize the facts. Chapter 766 of the Acts of 1972 took effect on September 1, 1974.[3] At that time, the child whose educational plan is the subject of this appeal was a resident of Amherst and had, for a number of years prior to 1973-1974, attended, and received special educational services in, the Amherst public schools. There is no dispute that the child suffers from a rather severe learning disability and, as such, is a "child with special needs" within the meaning of G. L. c. 71B.

By the end of the 1972-1973 school year, the child had completed the sixth grade and was about to be enrolled in the regional junior high school. The parents, however, were dissatisfied with the child's progress in the public schools, and so voluntarily placed him in a private school in Vermont during the 1973-1974 academic year.

In September, 1974, the parents enrolled the child in the Eagle Hill School, a private residential school located in Massachusetts. Additionally, they referred the child for evaluation in accordance with the newly effective c. 766. In compliance with the statute, a "core evaluation team" (CET) was assembled to develop an educational plan appropriate for the child's special needs.[4]

---

[3] St. 1972, c. 766, § 23.
[4] See 8 Code Mass. Regs. Part 3, §§ 317.0-319.0 (1974).

On November 19, 1974, the CET proposed an educational plan under which the child would spend approximately 80% of his school time in regular classrooms and approximately 20% of that time in various in-school programs designed to provide assistance in mathematics and language arts. The parents rejected the plan on December 10, 1974.

After passage of a conciliation period (see 8 Code Mass. Regs. Part 3, § 400.0 [1974]), the CET convened with the parents and representatives of the Eagle Hill School in an effort to formulate a new plan. As a result of the conference, the CET submitted to the parents a revised plan which proposed that the child spend 57% of his school time in regular classrooms and 43% of his time in special programs. The parents rejected that plan on February 28, 1975, and requested a hearing pursuant to G. L. c. 71B, § 3.

The bureau held the requested hearing on May 6, 1975. After considering the testimony of several witnesses, including the chairman of the CET, officials of the Eagle Hill School, the director of the Learning Disabilities Center at Mount Holyoke College, and the parents, a hearing officer concluded: "[The child's] present situation, social, emotional, and educational is so tenuous that any placement other than a residential one . . . would be inappropriate. The specific program at Eagle Hill School . . . is appropriate to these special needs." The director of the bureau approved this decision on May 22, and the child's father accepted the ruling on September 8, 1975.

On September 24, 1975, a department official wrote a letter to the superintendent of the Amherst-Pelham public schools to clarify the bureau's decision. In the letter, it was asserted that; "1. The Amherst-Public Schools are responsible for providing the program and placement . . . for [the child] from the point of the initially rejected plan (December 10, 1974) until such time as the CET, upon

review of his progress at Eagle Hill, feels capable of providing a comparable program in the Amherst Public Schools . . . . 2. Responsibility for payment for this placement is that of the Amherst Public and should be retroactive to the date of the initially rejected plan . . . ."

In October, 1975, the school committee commenced the present action for judicial review under G. L. c. 30A, § 14. Before the case was reached for trial, however, the following occurred.

On November 26, a judge of the Superior Court granted a motion by the department to remand the matter to the bureau for issuance of a decision containing findings of fact and statement of reasons in compliance with G. L. c. 30A, § 11(8). After reviewing both a transcript of the hearing and certain documentary evidence, a bureau hearing officer wrote a substitute decision which was filed in the Superior Court on December 23, 1975. A supplement to this decision, discussing an additional thirty pages of documentary evidence inadvertently omitted from the material provided to the hearing officer, was subsequently filed.

The substitute decision essentially affirmed the conclusions of the original hearing officer. In this decision, the bureau found that (1) the 57%-43% educational plan proposed by the Amherst-Pelham CET was inadequate for the child; (2) even a 100% program in the Amherst-Pelham school system would be presently inadequate to meet the child's special needs; and (3) the only appropriate program proposed at the hearing was the residential program offered at the Eagle Hill School. The hearing officer ruled, therefore, that the child should remain at the Eagle Hill School for the remainder of the 1975-1976 school year.

On February 9, 1977, just prior to trial, the department promulgated two "Policy Statements" in which it took the position that (1) the bureau had the authority to order retroactive payment of private school costs by school committees, and (2) the bureau had the authority, after hear-

ing, to direct placement of students in particular private schools without prior consultation with the responsible school committees.

There was testimony that both policy statements accurately reflected the department's interpretation of the statute since its inception. It was stipulated by the parties, however, that no such *written* policy had been issued by the department prior to September 24, 1975, the date on which the school committee was informed of its financial responsibilities in the instant case. The policy statements do not purport to be regulations of the department and were not promulgated in accordance with the requirements of G. L. c. 30A.

1. In the first reported question, the judge below asks whether, after finding a school committee's proposal inadequate to meet the special educational needs of a child, the bureau may proceed without further school committee involvement and place the child in an appropriate program acceptable to the parents. It is important to note that the reported questions do not question official authority under c. 766 to provide private residential programs such as the one recommended here.[5] Indeed, the judge recognized that, under c. 766, children who are found to require such services are entitled to receive

---

[5] In their briefs on appeal, the school committee and amici towns of Lexington, Dover, and Sherborn, suggest that there is serious question whether public payments of the costs of such programs would withstand constitutional scrutiny under art. 18 of the Amendments to the Massachusetts Constitution, superseded by art. 46, as amended by art. 103 (the "Anti-Aid Amendment"). This question was expressly left open in *Bloom* v. *School Comm. of Springfield, ante* 35, 47-48 & n. 23 (1978). We decline to reach it here. First, it is significant that neither question was reported by the judge or raised in the pleadings below. Second, the parties assert their claim only with respect to retroactive payments, even though a ruling on the issue would affect all payments of public funds to private institutions. We note that the issue has been raised in a case now pending in this court. *Commonwealth* v. *School Comm. of Springfield*, Supreme Judicial Court Civil Action No. 76-43 (1976). That case may raise the constitutional issue for determination on an appropriate factual record.

them as a matter of right. See G. L. c. 71B, § 2 (8). See also
G. L. c. 15, § 1M; G. L. c. 71B, § 4. Instead, the reported
questions raise a more narrow question concerning the
procedure to be followed under c. 766 once the bureau has
found the CET proposal inadequate and has recommend-
ed an appropriate alternative.

The relevant portion of the statutory scheme is found
in G. L. c. 71B, § 3, inserted by St. 1972, c. 766, § 11.
Where, as here, a parent rejects the school committee's
proposed educational plan, the statute, G. L. c. 71B, § 3,
authorizes the bureau to hold a hearing concerning the
"appropriate education program" for the child. "At the
conclusion of said hearing . . . the [bureau] may recom-
mend alternative educational placements to the parents
. . . and [the] parents . . . may either consent to or reject
such proposals." The section describes in great detail the
options available to parents who decide to reject the bur-
eau's recommendation. The section outlines no further
procedure, however, once the parents have accepted a
bureau recommendation.

The school committee contends that this legislative si-
lence must not be read in a manner which excludes fur-
ther school committee participation at this stage.[6] Both
the language and purpose of the statute, it argues, re-
quire the local school committee to take an active role in
any decision regarding a child's educational plan.

The school committee notes, for example, that under
G. L. c. 71B, § 3, it is the local school committee, and not
the bureau or the department, which bears the initial
responsibility for identifying, evaluating, and developing
appropriate programs for each school age child with spe-
cial needs. More specifically, where the task is choosing
an appropriate residential school for a child, various
regulations set forth in great detail the local school com-

[6] This position is shared by the towns of Franklin and Wayland, and
by the school committees of the towns of Lexington, Dover, and Sher-
born as amici.

mittee's important role in the selection process. See, e.g., Regs. §§ 502.6-504.3. Once the selection is made, moreover, it is the school committee which is empowered by G. L. c. 71B, § 4, to enter into agreements with public or private institutions in order to provide the educational programs required in each individual case.

By contrast, the school committee contends, several provisions of G. L. c. 71B suggest only a limited role for the department in decisions concerning a child's educational program. Thus, § 10 of G. L. c. 71B, inserted by St. 1972, c. 766, § 11, provides that the "department may . . . refer children requiring special education to any institution within or without the commonwealth," but only "upon the request of the parents or guardians and the recommendations of a local school committee." Further, § 3 provides that, in the event of a disagreement between the school committee and the parents, it is the bureau's function only to "recommend" alternative programs.

In light of these provisions the school committee asserts that, where there is dispute concerning the appropriate educational program for a child, it would be inconsistent to allow the bureau simply to implement a plan acceptable to the parents, without requiring further input from the local school committee. Rather, the school committee suggests that, after the bureau makes a recommendation, the matter essentially must be remanded to the school committee, thereby affording it the opportunity to "investigate, inspect, recommend or withhold recommendation of institutions" considered for potential placement.

We do not agree. We think that, under § 3, the bureau may recommend a specific alternative placement for the child. Moreover, once the bureau has found a school committee proposal inadequate and has recommended an alternative to which the parents agree, the statute neither requires nor suggests further school committee input in the decision making process. Rather, the plain implication of § 3 is that, when the parents accept the bureau's

program recommendation, the school committee must provide that program to the child "without any unnecessary delay." See Reg. § 410.0.

We find support for our conclusion in both the language and the structure of § 3. Under that section, it is clear that, before a placement recommendation is made, both the parents and the school committee are given an opportunity to offer evidence in support of their specific proposals. See G. L. c. 30A, § 11 (3). In addition, nothing in § 3 precludes the parties from offering alternative proposals if they wish. Once the hearing is completed, however, the statute authorizes the bureau to recommend not merely a general placement prototype, but rather, alternative educational placements. It is significant that, under § 3, the bureau's recommendations are made only to the parents, and not to the local school committee. Additionally, it is only the parents who have the statutory right to reject the bureau's recommendation. Where the parents exercise this option, moreover, the statute outlines in great detail their additional avenues of review. By contrast, § 3 has no comparable provision for school committee involvement at this stage.

In light of the statutory attention to detail when outlining the parents' role in the procedure following a bureau recommendation, we think that, if the Legislature had intended a similar participatory role for the school committee, it would have said so. Cf. 2A C. Sands, Sutherland Statutory Construction § 47.23 (4th ed. 1973 & Cum. Supp. 1978). The implications of legislative silence on this issue are clear; the school committee's planning role was intended to cease once the bureau found it necessary to recommend an alternative plan.

We think it significant that the department's interpretation of § 3, as expressed in the regulations found in 8 Code Mass. Regs., Part 3, at 258 (1974), is consistent with our own. See *Cleary* v. *Cardullo's, Inc.*, 347 Mass. 337, 343-344 (1964). See also *Consolidated Cigar Corp.* v. *Department of Pub. Health*, 372 Mass. 844, 850 (1977). In a

chapter entitled "Appeal Procedures," Regs. §§ 404.1-404.4, provide that, after a requested hearing, the bureau must recommend within thirty days either: (1) the program proposed by the administrator of special education; (2) the program proposed by the parents; (3) the program suggested after an independent evaluation; or (4) an alternative program, presumably of the bureau's own design. Where the parents reject the bureau's recommendation, the regulations essentially track the statute in providing additional avenues of review. Where the parents agree with the bureau's recommendation, however, the regulations indicate that the recommended placement "shall be made forthwith, without any unnecessary delay." Reg. § 410.0. Apparently, then, the agency envisioned the school committee simply as one of the adversary parties in the appellate process. Accordingly, it left the actual resolution of the placement issue to the bureau, subject only to parental approval.

The statutory provisions cited by the school committee are not to the contrary. It must be remembered that the framers of c. 766 sought to design a system under which parents would no longer be required to go beyond their local school districts to find adequate, individually designed educational programs for children with special needs. See generally St. 1972, c. 766, § 1; G. L. c. 71B, § 3. Such a system, of course, required much legislation of an enabling nature.

Thus, under § 3, the local school committee was authorized to initiate the process of identifying and evaluating children with special educational needs. Where the school committee and the parents agreed on an educational program for a special needs child, see G. L. c. 71B, § 3, the Legislature empowered the school committee to contract with public or private institutions to provide that program. G. L. c. 71B, § 4. Similarly, where the school committee and the parents decided that a program outside the local school district was necessary, and where they obtained the required department approval, the

statute granted to the department power to refer a child to "any institution within or without the commonwealth" which would provide the appropriate program.

These enabling provisions are clearly designed to effectuate those educational decisions made jointly by the parents and the local school committee. They do not, however, shed light on the procedures to be followed when the parents and the school committee disagree. That procedure is governed by the specific language of § 3, which makes no provision for further school committee input once the bureau had found it necessary to offer an alternative plan.

We do not think that this result precludes all school committee participation in the ultimate placement decision. As noted above the school committee is free at the bureau hearing, not only to offer the proposal it finds most appropriate, but also to suggest any supportable alternative proposal which may be more consistent with the parents' desire. Such an approach guarantees that the bureau will consider the school committee's position with respect to a variety of educational programs. It limits school committee participation only after the bureau has heard the evidence, and has made a placement recommendation to the parents.

2. The second reported question concerns the school committee's financial responsibility to parents who have provided at their own expense the educational services later found to be necessary to meet their child's special educational needs. No provision of c. 766 addresses this problem directly. We have held, however, that, "[w]hile an administrative or executive interpretation cannot bind the courts, weight should be given 'to any reasonable construction of a regulatory statute adopted by the agency charged with . . . [its] enforcement.' " *School Comm. of Springfield* v. *Board of Educ.*, 362 Mass. 417, 441 n.22 (1972), quoting from *Investment Co. Inst.* v. *Camp*, 401 U.S. 617, 626-627 (1971). See *Board of Educ.* v. *Assessor of Worcester*, 368 Mass. 511, 516 (1975), and cases cited. See

also *Consolidated Cigar Corp.* v. *Department of Pub. Health,* 372 Mass. 844, 850 (1977). This principle is particularly true where, as here, (1) the statute itself vests broad powers in the agency to fill in the details of the legislative scheme (see, e.g., St. 1972, c. 766, § 1; cf. *Consolidated Cigar Corp., supra* at 850); (2) the agency has participated in the actual drafting of the legislation, *Board of Educ., supra* at 516; and (3) the interpretation at issue has been consistently applied, *id.*[7] Giving the department's policy statements the deference to be accorded in these circumstances, we conclude that its interpretation of the school committee's financial obligations is both reasonable and consistent with the statutory scheme.

We note at the outset that this is not a case in which parents have withdrawn their child voluntarily from the c. 766 system. Indeed, these parents invoked the statutory process as soon as it became effective. Consequently, their child became entitled to "an adequate, publicly supported education" consistent with his special needs. St. 1972, c. 766, § 1. If the statutory system had worked as intended, the child would have received publicly funded educational services after his parents had accepted the originally proposed plan. We think that the policy adopted by the department exactly preserves this legislative goal.

---

[7] The department presented evidence that the reimbursement policy at issue here had been formulated prior to the effective date of c. 766. Further, there was evidence that the policy had been applied consistently in cases where the school committee's proposal was found inadequate, and where the program supplied by the parents at their own expense was found appropriate.

It is only on appeal that the school committee seeks to contradict this evidence by offering a letter stating the department's policy with respect to non-c. 766 private placements. Because this evidence was not introduced at trial, it is not properly before us on review. *Custody of a Minor,* 375 Mass. 733, 736 n.1 (1978). Moreover, the evidence is not "contradictory" in nature. By addressing itself only to departmental policy concerning children placed in private schools *not* pursuant to c. 766, the statement does not apply here where the parents sought to invoke c. 766 for the benefit of their child.

In this case, the parents chose to reject the proposed plan, in a belief that appropriate services could be provided only in a private residential setting such as the one offered at the Eagle Hill School. Rather than (1) limiting their child to a "regular education program" which, from the beginning, was known to be inappropriate, or (2) placing the child in a program for which the school committee was willing to pay, the parents. continued the child's placement at the Eagle Hill School. In so doing, they assumed a financial risk that the bureau would recommend a different placement.[8] The bureau's decision, after hearing, however, found the parents' course of action to be correct. In these circumstances, the departmental policy requiring reimbursement places the parent and child precisely where they would have been had the school committee initially fulfilled its statutory obligations in evaluating the child.

The school committee and amici object to this result on several grounds. First, they contend that the plain language of G. L. c. 71B, § 3, and of Reg. § 327.0, is inconsistent with a policy of retroactive reimbursement. These sections provide that, during the process of administrative appeal, a child "shall be placed in a regular education program unless such placement endangers the health or safety of the child or substantially disrupts such education program for other children." Section 327.0 alternatively provides that unless the parents and school committee agree in writing the child may remain in the spe-

---

[8] Indeed, Reg. § 504.3 carefully defines the circumstances in which the bureau may refer a child for placement in a residential school outside the city, town, or school district in which the child resides. For example, had the bureau found that (1) there was a program available within the city, town, or school district which was adequate for the child, or (2) the CET's placement list included other residential programs consistent with the child's educational needs, the bureau would have had to recommend a placement other than the one proposed by the parents. Reg. § 504.3 (b) (i)-(iii). In these circumstances, the school committee is not financially responsible for the parents' placement choice.

cial education program such child is in. The school committee and amici assert that these provisions articulate the extent of the school committee's responsibilities for placement during the appeal, and, as such, preclude the assessment of the additional financial responsibilities as suggested by the department.

We do not agree. We think that the language quoted above simply addresses the practical question of placement during the appeals process, a period of time in which no program has yet been adopted. The provisions seek to ensure that, during this period, the child experiences the least possible disruption in his educational program. They in no way undercut the school committee's responsibilities initially to provide an adequate educational plan.

The school committee also argues that G. L. c. 44, § 31, barring municipal departments from incurring liabilities for which there are no appropriations, prohibits it from paying for special educational services in accordance with the bureau's order. The committee's reliance on G. L. c. 44, § 31, fails on several counts.

First, the school committee has made no showing through evidence that funds were unavailable to it to pay for special educational services for this child.[9] Second, the school committee is, by law, given the right to compel appropriations in the amount it deems necessary for providing a city's or town's educational needs, specifically including special education costs. See G. L. c. 71B, § 5. See also G. L. c. 71, § 34; *Pirrone* v. *Boston*, 364 Mass. 403, 406 (1973); *Casey* v. *Everett*, 330 Mass. 220, 221-224 (1953). Moreover, were the towns of Amherst or Pelham to evade their responsibilities to appropriate the necessary funds, they could be compelled to do so by the courts. See generally *Board of Health of N. Adams* v. *Mayor of N. Adams*, 368 Mass. 554 (1975). We have held that G. L. c. 44, § 31,

---

[9] Indeed, the school committee never raised this claim in its complaint.

"provides an important central municipal control on irresponsible spending by departments of local governments, but its function is not to bar local spending that is required by a valid State program." *Board of Health of N. Adams* v. *Mayor of N. Adams, supra* at 566. Thus, we conclude that the school committee is not limited by the municipal finance law in its ability to reimburse parents for special educational services found necessary to meet a child's needs under c. 766.

The school committee suggests that, as a general proposition of administrative law, reimbursement should not be required before the conclusion of judicial review. Such an argument simply leaves unaddressed the department's authority under c. 766 to require reimbursement. Indeed, the committee's position apparently applies equally to support a school system's refusal to pay for payment not only prior to the bureau's decision, but afterward as well. More fundamentally, the contention has no basis in law. Chapter 30A specifically provides that the filing of a complaint for judicial review by itself does not stay the agency's decision. G. L. c. 30A, § 14 (3). No stay was ever sought by the school committee in this case.

Finally, the amici school committees of Lexington, Dover, and Sherborn argue that the department's policy discriminates against poorer parents who cannot afford to place their children privately pending a decision on their appeal. Assuming, without deciding, that the school committees have the proper standing to assert such a claim (but see *Singleton* v. *Wulff*, 428 U.S. 106, 113-116 [1976]), we are unpersuaded by their argument. First, we think that reimbursement may in fact be economically fairer to poorer families who otherwise may forgo providing interim educational services which they believe to be necessary. Second, we are aware that, even with a reimbursement policy, some families may not be able to afford the financial risk involved in interim private placement. However, it is well recognized that, because government in the social welfare area cannot do all that it wishes, it

need not be restrained from taking the first steps. See *Williamson* v. *Lee Optical of Okla., Inc.*, 348 U.S. 483, 489 (1955). *Opinion of the Justices*, 368 Mass. 831, 848 (1975). That some children may lose adequate services pending appeal as a result of a school system's inadequate evaluations is no basis for enjoining public support for parents who undertake the services themselves.

3. In their briefs, the parties have addressed the school committee's claims that (1) because the initial bureau decision was issued three months rather than one month after the hearing as provided by Reg. § 404.0, it was invalid; and (2) the delay caused by remand of the matter to the bureau and the issuance of a substitute decision constitute grounds for reversal. It is well settled that interlocutory questions not presented on report are generally not considered. See *Reynolds* v. *Missouri, Kan. & Tex. Ry.*, 224 Mass. 379, 388 (1916).[10] See also *Pollack* v. *Kelly*, 372 Mass. 469, 470-471 (1977). We reach the issues, however, for the future guidance of the parties, and conclude that the school committee's claims are without merit.

The school committee's argument concerning the initial three-month delay on the issuance of the bureau's decision fails in two respects. First, a long line of cases establishes the principle that "a statute imperative in phrase . . . where it relates only to the time of performance of a duty by a public officer and does not go to the essence of the thing to be done . . . is only a regulation for the orderly and convenient conduct of public business and not a condition precedent to the validity of the act done." *Cheney* v. *Coughlin*, 201 Mass. 204, 211 (1909). Accord, *Cullen* v. *Building Inspector of N. Attleborough*, 353 Mass. 671, 679-680 (1968); *Monico's Case*, 350 Mass. 183, 185-186 (1966). Cf. *Kiss* v. *Board of Appeals of Longmeadow*, 371 Mass. 147, 157-158 (1976).

---

[10] The school committee properly does not argue that the issues raised are of such substantial import and emergency as to warrant the exercise of our extraordinary powers of review under G. L. c. 211, § 3. See *Rollins Environmental Servs., Inc.* v. *Superior Court*, 368 Mass. 174, 180-181 (1975).

Neither G. L. c. 71B, § 3, nor any other provision in c. 766 prescribes a time limit for the bureau's decisions. Rather the department, in an effort to advance the statute's purpose of providing a child with an appropriate special education program as soon as possible, has provided in its regulations that the bureau's decisions should be issued within thirty days of a hearing. Reg. § 407.0. If mandatory time provisions in statutes do not invalidate an otherwise valid action by a public officer or agency, the time limitations which an agency sets for itself are at least as flexible. See *Monico's Case, supra*. While there may be a case in which procedural delays in rendering a decision defeat the statute's very purpose, the school committee has not demonstrated this to be such a case.

Second, in order to obtain relief from the bureau's decision on its claim of procedural delay, the school committee must demonstrate that the delay has harmed its substantial rights. *Duato* v. *Commissioner of Pub. Welfare*, 359 Mass. 635, 640 (1971). *Clarke* v. *Board of Collegiate Auth.*, 327 Mass. 279, 282 (1951). The school committee has failed to make this necessary showing.

The hearing at issue here was held on May 6, 1975, near the end of the school year. The decision was apparently received by the school committee at the end of the summer, a period when the school committee was not obligated to provide special educational services. As a practical matter, therefore, no consequences adverse to the school committee flowed from its receipt of the bureau's decision on September 8, 1975, rather than on June 5, 1975.

The school committee next claims that the remand to the bureau for issuance of a substitute decision delayed its attempts to secure judicial review, and thereby added to the time it was responsible for paying for private placement. This claim is groundless. The school committee does not now contest that a private placement was required, and that its own plan was inadequate. Indeed, during the delay at issue, the child was receiving the

necessary services for which the school committee was responsible in any case. We note, in addition, that by filing its complaint after the initial decision was issued, the school committee preserved its right to judicial review. Had the school committee believed that substantial rights would be impaired during the remand period, it could have sought to stay the effect of the initial decision pending either the issuance of the substitute decision, or the resolution of the action. G. L. c. 30A, § 14 (3).

Finally, the school committee claims to be harmed, in some undefined manner, by the substitution of a second hearing officer. It does not argue, however, that the credibility of any witness is at issue, something which the second hearing officer could not judge. Indeed the committee does not contest the validity of any of the second hearing officer's findings. Thus, we discern no prejudice to the school committee resulting from the issuance of a substitute decision by the second hearing officer.

4. We answer the first two reported questions in the affirmative and, as to the third question, we answer that parents who have provided necessary services at their own expense are entitled to retroactive reimbursement from the date at which they rejected the school committee's inadequate plan where, as in the instant case, the parents' plan is subsequently approved. The case is remanded to the Superior Court Department for further proceedings consistent with this opinion.

*So ordered.*