Agnes , Peter W., J.
In this case, the Doctor Franklin Perkins School (“Perkins”) has sued the King Philip Regional School District (“King Philip”) and the Massachusetts Department of Social Services (now known as the Department of Children and Families) (“DCF”) for payment of unpaid tuition bills for the schooling and housing of a special education student (“S”). Perkins has moved for summaxy judgment on all counts. Both King Philip and DCF have filed cross motions for summary judgment. For the reasons set *550 forth below, Perkins’ motion is ALLOWED in so far as the court finds that Perkins is entitled to full recovery of the unpaid tuition bills. DCF’s motion is ALLOWED, and King Philip’s motion is ALLOWED in part and DENIED in part.
BACKGROUND
Beginning in October 2003, King Philip was the responsible local educational agency (“LEA”) for a fifteen-year-old student, S, who had the following disabilities: Major Depressive Disorder, Social Anxiety Disorder, and Post-traumatic Stress Disorder. At this time, S was in the custody of DCF. On July 11, 2003, DCF placed S in the residential education program (“Res. Ed. Program”) at Perkins. DCF fully funded this placement through October 28, 2003, at the daily rate of $357.32, which amounted to $130,422.56 per year.
King Philip and DCF sought to enter into an Agreement to share the costs of S’s educational and residential placement for Fiscal Year 2004, which was to go into effect on October 29, 2003 and last until June 29,2004. The Agreement provided thatDCFwould pay sixty percent of the cost and King Philip would pay forty percent. The Agreement further provided Perkins would be paid the “residential rate established” by Operational Services Division (“OSD”), which in this case amounted to a total of $357.32 per calendar day. On October 15, 2003, Francis X. Galligan, the DCF Area Director, signed the Agreement. The King Philip Interim Superintendent, Richard Robbat, signed the Agreement on October 22, 2003. The King Philip Director of Special Education, Sally Winslow (“Winslow”), returned the Agreement to DCF with a cover letter. Winslow placed an asterisk next to the dollar amount King Philip was to pay. Next to another asterisk at the bottom of the Agreement was handwritten, “(s]ee attached letter dated 10/21/03.” In her letter, Winslow wrote that King Philip .understood that the Agreement “covers in-school days only [to] exclude weekends, school vacations and holidays, for a total of 152 days.”
Based on the October 21, 2003 letter, King Philip refused to pay $142.93 per calendar day and, instead, only paid for each school day. Perkins accepted the periodic partial payments from King Philip, but there was also correspondence between the parties in which Perkins insisted King Philip was paying the wrong rate.
On August 10, 2004, King Philip and DCF executed another Agreement for S’s tuition for Fiscal Year 2005. The new annual rate for the Day Program was $49,204.23, and the daily Day Program rate was $225.71 for a 218-day year. The Res. Ed. Program annual price was set at $136,390.09, with a daily price of $373.67. This time, the King Philip Director of Special Education crossed out the word “calendar” and wrote in “school” before the word “day,” and also added the following notation at the bottom of the pre-printed Agreement: “King Philip agrees to fund school days only between 9/9/04 — 6/30/05 at the rate of $142.93/day, for a total of 180 days.” DCF signed the Agreement with the above changes. On November 23, 2004, S withdrew from Perkins. In October 2006, Perkins filed a complaint against King Philip and DCF seeking Declaratory Judgment (Count I), asking the court to declare the following rights:
a. That the “authorized price” set by OSD is neither a maximum amount, nor merely a rate that can be applied to school days only, but is instead the annual price based upon calendar days;
b. That the defendants, individually and jointly, are required to pay Perkins for services rendered in Fiscal Year 2004 and Fiscal Year 2005, in amounts that combine to total the annual authorized prices set by OSD; and
c. That Perkins receives such other relief as this Honorable Court feels fit and proper, including the costs, expenses, and attorneys fees that Perkins has expended in this lawsuit, and all other relief to which it is entitled.
Perkins also seeks damages for breach of fiscal year 2004 contract (Count II), and breach of fiscal year 2005 contract (Count III).
DISCUSSION
I. Standard of Review
Summary judgment is granted when there are no genuine issues of material fact and when the moving party is entitled to summary judgment as a matter of law. Mass.R.Civ.P. 56(c); 369 Mass. 550, 553 (1976). The moving party bears the burden of affirmatively demonstrating the absence of a triable issue, and that the moving party is entitled to judgment as a matter of law. Pederson v. Time, Inc., 404 Mass. 14, 16-17 (1989). A party moving for summary judgment who does not bear the burden of proof at trial may demonstrate the absence of a triable issue by showing that the nonmoving party has no reasonable expectation of proving an essential element of its case at trial. Kourouvacilis v. General Motors Corp., 410 Mass. 706, 716 (1991). Once the moving party establishes the absence of a triable issue, the party opposing the motion must respond and allege specific facts establishing the existence of a genuine issue of a material fact. Id. at 717. The nonmoving party cannot defeat the motion for summary judgment by resting on his or her pleadings and mere assertions of disputed facts. LaLonde v. Eissner, 405 Mass. 207, 209 (1989).
II. Requirement to Exhaust Administrative Appeal
King Philip argues that Perkins has failed to exhaust its administrative remedies under the Individuals With Disabilities Education Act (“IDEA”)[2] and the matter should be dismissed for failure to state a claim upon which relief can be granted and for lack of subject matter jurisdiction. IDEA’S administrative procedures provide parents an opportunity “to participate in meetings with respect to the identification, evaluation, and educational placement of the child, and the *551 provision of a free appropriate public education to such child, and to obtain an independent educational evaluation of the child.” 20 U.S.C. §1415(b)(l). DCF argues that Perkins was not required to exhaust the administrative remedies here because it was not the aggrieved party involved in developing S’s individual education plan (“IEP”). Moreover, according to DCF, the only issues involved in this case require interpreting a contract and identifying the proper party that should pay Perkins’ unpaid costs, neither of which require particular expertise in special education law.
This case is correctly before this court and Perkins was not required to exhaust administrative remedies. There is a strict requirement that an aggrieved party exhaust administrative remedies. See 20 U.S.C. §1415(1). However, this requirement is not absolute. Frazier v. Fairhaven Sch. Comm., 276 F.3d 52, 59 (1st Cir. 2002). In other words, the administrative proceedings assist an agency in developing a factual record, applying its expertise to the problem, exercising its discretion, and correcting its own mistakes. Christopher v. Portsmouth Sch. Comm. 877 F.2d 1089 (1st Cir. 1989). In addition, such proceedings promote accuracy, efficiency, agency autonomy, and judicial economy. Id. This case is distinguishable from the cases on which King Philip relies because those cases required the experts in the field to evaluate whether the educational services provided actually were adequate. See Susan S. & Falmouth Public Sch & Cotting Sch, Bureau of Special Education Appeals, BSEA #05-1581 (where one issue for hearing was whether the school inappropriately terminated student); Lolani & Northampton Public Sch, Bureau of Special Education Appeals, BSEA #04-0359 (holding that “(t]aken together the clear regulatory language of the ’stay put’ provisions and the private school student protections demonstrate the drafters’ intention that all students, no matter where they receive special education services, are entitled to [receive free public education) while their IDEA disputes are being heard”).
Here, the adequacy of S’s education or whether S deserves free public education is not a disputed issue. The only issues are identifying the proper party to pay Perkins’s bills and interpreting a contract, none of which require particular expertise in special education. Furthermore, King Philip is mistaken in its contention that an aggrieved private school must proceed to the Massachusetts Bureau of Special Education Appeals (“BSEA”) before initiating a judicial action because these schools lack standing to initiate actions before the BSEA. According to BSEA Hearing Rule I, entitled, “Who May File a Hearing Request,” a hearing may be requested by only the following parties:
1. The student, if age 18 or over;
2. The parent(s);
3. The legal guardian, individual with court-appointed educational decision-making authority or duly appointed educational surrogate parent;
4. The programmatically and or fiscally responsible school district, state educational agency or other public agency;
5. An individual with whom the child lives and who is acting in place of the parent; or
6. An attorney or advocate for any of the above.
Thus, while Perkins could have been a party at the BSEA, it could not have brought its claims there.
III. Declaratory Judgment
Whether to grant a declaratory judgment, in circumstances in which another remedy may be available, lies within the court’s discretion. Massachusetts Mut. Life Ins. Co. v. Commissioner of Corp. & Taxation, 363 Mass. 685, 688 (1973). As indicated later in this decision, this court has decided to order the defendants to pay Perkins for its unpaid tuition bills. This result makes it unnecessary to declare Perkins’ rights regarding the unpaid tuition bills. To the extent that Perkins fails to cite to a statute, and encourages this court to exercise its discretion in awarding counsel fees, this Court sees no reason to depart from the so-called “American rule,” which “prohibit[s] successful litigants from recovering their attorneys fees and expenses except in a very limited class of cases.” Preferred Mutual Insurance Co. v. Gamache, 426 Mass. 93, 95 (1997). Thus, this court grants no attorney fees to Perkins.
IV. Breach of Fiscal Year 2004 Contract
Perkins argues that because both King Philip and DCF explicitly agreed to collectively pay funds to Perkins in a total amount of $357.32 per calendar day and Perkins- was the intended third-party beneficiary of the Fiscal Year 2004 Contract, it should be paid $13,578.35, the difference between the OSD based authorized price and what King Philip actually paid to Perkins that year. In its cross motion for summary judgment, DCF contends that for fiscal year 2004, there was no enforceable contract between it and King Philip, thus King Philip should pay Perkins the unpaid tuition of $11,217.79 based on the legal mandates prescribed in Administrative Advisory SPED 2004-4. In its cross motion for summary judgment, King Philip argues that Perkins erroneously relies on OSD regulations to claim that it is entitled to receive the authorized rate set by OSD. Moreover, King Philip argues that it had the ability to enter into a cost-sharing agreement with DCF and this court should enforce that agreement. King Philip also argues that even legal mandates prescribed in Administrative Advisory SPED 2004-4 are not applicable here because the advisory opinion went into effect on April 12, 2004, which was after July 11, 2003, when S enrolled at Perkins. Additionally, King Philip argues that Perkins is barred from seeking additional payments under the theories of accord and satisfaction and equitable estoppel.[3]
First, it is important to determine whether or not DCF and King Philip entered into an enforceable con *552 tract for Fiscal Year 2004. A contract requires the mutual assent of the parties for promised performance. The mutual assent must manifest an agreement between the parties on the terms of their respective intended promises. I&R Mech., Inc. v. Hazelton Mfg. Co., 62 Mass.App.Ct. 452, 454-55 (2004). If there is no agreement between the parties as to the material terms of the contract, there is no enforceable contract. Hunneman Real Estate Corp. v. Norwood Realty, Inc., 54 Mass.App.Ct. 416, 421 (2002). Both parties must have intended to be bound to the same provisions. Id. If a party purports to accept an offer but the acceptance varies an essential and material term of the offer, then there is no binding agreement or shared intention between the parties. Massachusetts Housing Fin. Agency v. Whitney House Assocs., 37 Mass.App.Ct. 238, 241 (1994). Rather, the acceptance was not more than a counter offer. Id.
Here, King Philip and DCF had different intentions regarding how the costs of the tuition for S would be shared for Fiscal Year 2004. When King Philip signed the proposed agreement and, at the same time, declared that it intended to pay at the same rate for fewer days, it did not manifest its agreement with the terms proposed by DCF and thus there was no meeting of the minds. Rather, King Philip made a counter-offer. Under these circumstances, there was no mutual assent to the agreed terms, and execution of the agreement by King Philip did not work as an acceptance of agreed terms. If there was conflicting evidence on the question of whether there has been a contract created, the question would have been one for the jury. David J. Tierney, Jr., Inc. v. T. Wellington Carpets, Inc., 8 Mass.App.Ct. 237, 239 (1979). Here, there is no conflicting evidence on any of the material questions of fact, thus this court finds that there was no binding contract between DCF and King Philip for Fiscal Year 2004.[4]
Next, this court must determine whether Perkins is entitled to the unpaid tuition for Fiscal Year 2004. Under G.L.c. 71B, private schools cannot set their own special education tuition rates. Instead, the responsibility rests with the Division of Purchased Services (“DPS”), which operates under the OSD of the Executive Office for Administration and Finance. When the OSD sets the tuition rate that an approved school can charge for a particular program, it does so in the form of a specific “authorized price,” which is defined in 808 Code Mass. Regs. 1.02 as “[a] price which has been agreed upon in a contract or, in the case of G.L.c. 71B Programs, the price authorized by DPS.”[5] These tuition rates are authorized to be charged by fiscal year and must be accepted as full payment by the special education school when paid by a LEA under 808 Code Mass. Regs. §§1.02, 1.03(5). Accordingly, Perkins is entitled to the unpaid portion of S’s tuition bills.
The next issue is to ascertain the party who is responsible for the unpaid tuition to Perkins for the Fiscal Year 2004. General Laws c. 71B “requires every city, town or school district: (1) to identify the school age children residing in that district who have special needs: (2) to diagnose and evaluate the educational needs of such children; (3) to propose a special education program to meet those needs; and (4) to provide or to arrange for the provision of such special education programs.” Northbridge v. Natick, 394 Mass. 70, 72 (1985). The regulations of the Department of Education identify the “individual education plan” (“IEP”) as the document that sets out the special educational services that will be provided by the local school district. 603 Code Mass. Regs. §28.02. If a student’s educational needs can only be met by an out-of-district program, the IEP will identify such program and provide for the local district’s responsibility to fund it. 603 Code Mass. Regs. §§28.06(2)(a), 28.09. Sections 3 and 5 of G.L.c. 71B clearly impose the burden of paying for a special education program on the school district where the child needing the program resides. Boston v. Board of Educ., 392 Mass. 788, 792-93 (1984); 603 Code Mass. Regs. §28.10.
Moreover, according to G.L.c. 44, §31, the Municipal Finance Law, if the school committee in the school district where the student resides has funds available to pay for special educational services, it must pay for the student’s special education needs. Amherst-Pelham Regional Sch. Comm. v. Department of Educ., 376 Mass. 480, 494 (1978). “[T]he school committee, is by law, given the right to compel appropriations in the amount it deems necessary for providing a city’s or town’s educational needs, specifically including special education costs,” and if the school committee evades its responsibility to appropriate the necessary funds, the court may order such payments. Id. Here, King Philip participated in the process of developing S’s IEP and agreed to provide S day school services by placing him in the day program at Perkins. Due to a lack of a binding cost-sharing agreement, King Philip is entirely responsible for S’s educational costs at Perkins for the year in question.
According to an April 12, 2004 Department of Education publication entitled “Administrative Advisory SPED 2004-4: School Responsibility for Children in Special Education Day Schools Who Are Transferred to a Residential School by the Department of Social Services,” the costs of the residential school were to be shared as follows: “School districts will be responsible for either 50 percent of the residential school education, or, in the alternative, the day portion of the special education residential school costs as determined by the Operational Services Division (OSD) of the Executive Office of Administration and Finance.” The established day school tuition rate for the time period was $217.22 per school day for 218 days per year. At this rate, for the 151 schools days from October 29, 2004, King Philip was liable to pay a total of $32,800.22 to Perkins but only paid Perkins $21,582.43. Therefore, King Philip is responsible for *553 paying an additional $11,217.79 to Perkins. It is true that the Advisory Opinion went into effect after S enrolled into the Res. Ed. Program, but because DCF is willing to assume the responsibility for the additional unpaid balance, which amounts to $2,217.63, this court will not hold King Philip responsible for that amount.
V. Breach of Fiscal Year 2005 Contract
None of the parties contest the existence of an enforceable contract for Fiscal Year 2005. Perkins argues that because it is the intended beneficiary of the contract, it has standing and should be paid the authorized OSD price for Fiscal Year 2005. On their cross motions for summary judgment, both DCF and King Philip contend Perkins lacks standing to contest the contractual agreement between King Philip and DCF because Perkins is neither a party to the contract nor an intended third-party beneficiary.
To prevail on a claim of breach of contract as a third-party beneficiary, the plaintiff must show that the parties to the contract intended to give him the benefit of the promised performance. Anderson v. Fox Hill Vill. Homeowners Corp., 424 Mass. 365, 366 (1997). Regarding this matter, Massachusetts has adopted the Restatement (Second) of Contracts §302 (1981), which essentially states that to recover as a third-party beneficiary, the party must be an intended beneficiary and “when one person, for a valuable consideration, engages with another by simple contract, to some act for the benefit of a third, the latter, who would enjoy the benefit of the act, may maintain an action for the breach of such engagement.” Rae v. Air-Speed, Inc., 386 Mass. 187, 195 (1982), quoting Brewer v. Dyer, 7 Cush. 337, 340 (1851).
Massachusetts courts have further held that to ascertain the intention of the parties, “(w]e look at the language and circumstances of the contract . . . The intent must be clear and definite” (citations omitted). Anderson, 424 Mass. at 366-67. Here, Perkins was specifically identified in the contract as the intended recipient of the tuition funds at issue. Thus, Perkins has standing to seek enforcement of the terms of the contract. King Philip made clear it would only pay $142.93 per day for a total of 180 days between 9/9/04 and 6/30/05, and DCF accepted this agreement. Thus, DCF is responsible for the unpaid balance of $4,730.32 of S’s Res. Ed. tuition at Perkins.
ORDER
Perkins’ motion is ALLOWED in so far as this court finds that Perkins is entitled for the full recovery of the unpaid tuition bills. DCF’s motion is ALLOWED and King Philip’s motion is ALLOWED in part and DENIED in part. King Philip must pay $11,217.79 to Perkins for Fiscal Year 2004. DCF must pay $2,217.63 for Fiscal Year 2004 and $4,730.32 for Fiscal Year 2005.

The “Individuals With Disabilities Act,” IDEA, is the federal statute which governs how states and public agencies provide early intervention, special education, and related services to children with disabilities. It is designed to protect the rights of students with disabilities by ensuring that everyone receives a free appropriate public education (FAPE), regardless of ability. See Pub.L. No. 91-230, Title VI, §615, as added Pub.L. No. 108-446, Title I, §101, Dec. 3, 2004, 118 Stat. 2715 (codified as amended at 20 U.S.C. §1415 (2004)). See City of Boston v. Bureau Spec. Ed. Appeals, 2008 WL 2066989 (D.Mass. 2008).

Because the Court finds that there was no enforceable contract in Fiscal Year 2004, the Court does not see the need to address this defense.

The court notes that DCF’s failure to object to King Philip’s alteration does not constitute an implied acceptance by silence. “(A]s a general mle, silence in response to an offer to enter into a contract does not constitute an acceptance of the offer” Casavant v. Norwegian Cruise Line, Ltd., 63 Mass.App.Ct. 785, 798 (2005), quoting McGurn v. Bell Microprods, Inc., 284 F.3d 86, 90 (2002).

The authorized prices are generally expressed in two different ways: schools either have Res. Ed. programs, which are more intensive and operate for 365 days or have day programs, which are less intensive and only operate on “school days.” Price for the Res. Ed. program pertains to 365 (or 366 days, depending on leap year), and the price for Day Programs is limited to the number of “school days” in a particular year.