# United States Court of Appeals

## For the First Circuit

No. 01-1329

GEORGE R. MCGURN,

Plaintiff, Appellee,

v.

BELL MICROPRODUCTS, INC.,

Defendant, Appellant.

APPEAL FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Reginald C. Lindsay, U.S. District Judge]

Before

Selya and Lipez, Circuit Judges,
and Singal,* District Judge.

Robert W. Tollen, with whom Kent D.B. Sinclair and Seyfarth Shaw were on brief, for appellant.

Theresa Kelly Banash for appellee.

March 25, 2002

_____
 * Of the District of Maine, sitting by designation.

**LIPEZ, <u>Circuit Judge</u>.** This case requires us to evaluate the district court's application of an exception to the general rule that silence does not constitute acceptance of the terms of a contract offer.

## I.

Bell Microproducts, Inc. (Bell) mailed George R. McGurn a signed offer of employment, which stipulated that if McGurn was terminated without cause during the first twelve months of his employment with Bell he would receive a severance package worth $120,000. In countersigning and returning the offer letter, McGurn crossed out the word "twelve" and replaced it with "twenty-four." McGurn initialed his alteration, but otherwise did nothing to call it to Bell's attention. Bell terminated McGurn thirteen months later and refused to pay him the severance package on the ground that the twelve-month period stipulated in the offer letter had passed, and that McGurn's replacement of "twelve" with "twenty-four" was a counteroffer which Bell had never accepted.

McGurn filed an action in the Massachusetts Superior Court to collect the compensation he claimed Bell owed him under the contract, and Bell removed the case to federal district court on the basis of diversity of citizenship. The parties agree that Massachusetts law governs this dispute. Presented with cross-motions for summary judgment, the district court granted summary judgment for McGurn, finding that Bell's silence in response to McGurn's counteroffer constituted an acceptance of the 24-month termination clause. We find that conclusion premature. The import

of Bell's silence cannot be decided as a matter of law on a motion for summary judgment because of genuine issues of material fact about whether Bell knew or should have known of McGurn's counteroffer. We therefore vacate the district court's judgment and remand for further proceedings.

## II.

Except as noted, the following facts are undisputed. Bell Microproducts is a distributor of semiconductor parts and components with headquarters in San Jose, California. McGurn is a resident of Massachusetts. In March of 1997, Bell's President, Donald Bell, met with McGurn, who at the time was gainfully employed elsewhere, to discuss the position of Vice President for the Eastern Region at Bell. McGurn said that if he came to work for Bell he would require a written contract that included a "termination clause" stipulating that he would receive six months salary and half his commissions in the event that he was fired. During the next few months McGurn communicated several times with Bill Murphy, the Bell official to whom McGurn would report, and expressed interest in pursuing the position.

Based on these discussions, Murphy's secretary prepared an offer letter and delivered it to Linda Teague, Bell's Director of Human Resources. Teague dated the letter June 10, 1997, signed it, and mailed it to McGurn. Upon receipt of the letter, McGurn telephoned Murphy to discuss the offer and the absence of a termination clause. McGurn then had a series of telephone conversations with Donald Bell in which a termination clause was

-3-

discussed. On June 29, McGurn requested a termination clause that would remain in force as long as he worked for Bell. However, he also said to Donald Bell that he would consider one that was limited to the first twenty four months of his employment. According to McGurn, Donald Bell replied that a twenty-four month termination clause would be acceptable.

Teague then drafted a second offer letter, in consultation with Donald Bell, which she signed and dated July 1, 1997. The letter included a termination clause stipulating that "[i]f your status as an employee with Bell Microproducts is terminated within the first 12 months of employment for any reason other than gross misconduct, upon termination you will receive a six-month severance package." In response, McGurn drafted his own proposed offer letter, dated July 2, 1997, which included a paragraph on termination "for cause," defined as conviction of a felony or gross negligence or misconduct on the job, and a paragraph on termination "without cause," which was open-ended:

> [T]he Company may terminate your employment without cause. In such event, you will continue to receive your base salary for a period of six (6) months following your termination of employment, [and] . . . you will receive an additional lump-sum amount equal to $40,000 or 50% of annual incentive.

McGurn faxed his proposed offer letter to Murphy.

McGurn's next contact with Bell was his receipt of an offer letter dated July 3, 1997, signed by Teague. The letter included the following paragraph on termination without cause (we have underlined the material change from McGurn's July 2 proposal):

> [T]he Company may terminate your employment without cause.  In <u>the event that this occurs within your first twelve months of employment</u>, you will continue to receive your base salary for a period of six (6) months following your termination of employment, [and] . . . you will receive an additional lump-sum amount equal to $40,000 or 50% of annual incentive.

The letter concluded with Teague's request that McGurn "sign an acknowledgment of this offer of employment and return to me for our files."  The following appeared under Teague's signature:

> I acknowledge my acceptance of the offer as described above and my start date will be _____.
>
> Signed _____ Date _____

McGurn signed his name and entered "7-8-97" in the other two blank spaces. In addition, he crossed out the word "twelve" in the termination clause, inserted "twenty four" directly above it, and initialed the change.  The alteration was in the center of the second page of the two-page letter, five inches above McGurn's signature.  McGurn returned the letter to Teague (or possibly to Murphy), and started work on July 8, 1997.[1]

McGurn advised no one at Bell that he had modified the July 3 offer letter, and Teague, Murphy, and Donald Bell all deny having viewed the letter upon its return.  The Human Resources Department did receive the letter, but Teague testified that she herself would only have been notified if the letter had <u>not</u> been received, as McGurn could not have been paid unless a countersigned

---

[1]  Bell testified that he returned the letter to "Teague or Bill Murphy."  Teague testified that her department received the letter.

-5-

copy of the offer letter was in Bell's files. Although there is no direct evidence that anyone in the Human Resources Department examined the returned letter, there was evidence that it was Bell's practice to check that returned offer letters had been signed by the employee.

In or around April of 1998, Brian Clark (Murphy's successor at Bell) concluded that McGurn's performance was not satisfactory. At some point after Clark made this determination, but before he fired McGurn on August 3, 1998, Murphy discovered McGurn's alteration of the offer letter, and discussed it with Teague and Donald Bell. Upon learning of his termination on August 3, 1998, after approximately 13 months at Bell, McGurn conveyed to Clark his belief that his contract included a two-year termination clause. Clark disagreed, and Bell refused to pay the amounts specified in the termination clause.

McGurn sued Bell for breach of contract in the Superior Court of Middlesex County, Massachusetts. Based on diversity of citizenship, Bell removed the case to federal district court. 28 U.S.C. § 1332(a)(1). The parties filed cross-motions for summary judgment. In a Memorandum and Order dated February 15, 2001, the district court granted McGurn's motion and denied Bell's motion. The district court found that McGurn's alteration of the July 3 offer letter constituted a counteroffer which, in the circumstances of this case, Bell had accepted by its silence. The court entered judgment for McGurn in the amount of $120,000 plus interest, and Bell filed a timely notice of appeal.

### III.

The parties agree that McGurn's alteration of Bell's offer letter constituted a rejection of that offer and created a counteroffer. See Restatement (Second) of Contracts § 59 (1981) ("A reply to an offer which purports to accept it but is conditional on the offeror's assent to terms additional to or different from those offered is not an acceptance but is a counter-offer."). What is in dispute is whether Bell accepted McGurn's counteroffer. The district court concluded that it did because Bell should have known about the change made by McGurn, and hence its silence constituted an acceptance of McGurn's counteroffer:

> Although no one on behalf of the defendant signed McGurn's counteroffer, the defendant admits it received the offer and accepted McGurn's services for thirteen months. A presumably sophisticated employer who receives a signed letter of engagement from a prospective employee and fails to read the letter, particularly after weeks of negotiation, does so at its own peril. Thus, in the circumstances of this case, the defendant's failure to read the terms of the offer [does] not preclude the formation of a contract. The defendant accepted the terms of the plaintiff's offer when it decided to and did employ the plaintiff for thirteen months.

Urging a different theory than the "should have known" theory adopted by the district court, McGurn argues that Bell's silence in the face of his counteroffer amounted to an acceptance because Bell knew that McGurn had amended the termination clause, but gave no indication that it rejected the change. Bell denies that it knew about McGurn's alteration of the offer letter.

-7-

As a general rule, silence in response to an offer to enter into a contract does not constitute an acceptance of the offer. See Restatement (Second) of Contracts § 69 cmt. a ("Acceptance by silence is exceptional."); Polaroid Corp. v. Rollins Envtl. Servs. (NJ), Inc., 624 N.E. 2d 959, 964 (Mass. 1993) (noting that "silence does not ordinarily manifest assent"). There is, however, an exception to the rule against acceptance by silence "[w]here an offeree takes the benefit of offered services with reasonable opportunity to reject them and reason to know that they were offered with the expectation of compensation."[2] Restatement (Second) of Contracts § 69(1)(a).

In Gateway Co. v. Charlotte Theatres, Inc., 297 F.2d 483 (1st Cir. 1961), a case in many respects similar to this one, the defendant had sent the plaintiff two copies of a document which reduced to writing an oral agreement for the defendant to install air conditioning in the plaintiff's movie theater, with one copy to be countersigned and returned. Id. at 485. The plaintiff signed, but also inserted a provision that the work would be performed by a certain date. Id. The plaintiff returned the countersigned contract with a cover letter noting its "understanding" that the work would be performed by that date (although the letter made no

---

[2] Although the Restatement exception, by its terms, addresses a situation in which the offeree advances no payment at all in exchange for the offeror's services, the district court concluded correctly that the exception also applies when there is a dispute about the nature or extent of required compensation. See Polaroid, 624 N.E.2d at 964 (applying the exception to a dispute over whether a waste disposal contract included an indemnification clause).

reference to the alteration of the contract itself). Id. at 485-86. We stated that "[i]n the absence of actual knowledge [of the alteration of the contract], the test is whether there was reason for [the defendant] to suppose that such addition might have been made." Id. at 486. We held that because of the cover letter flagging the issue, defendant's silence could constitute acceptance of plaintiff's counteroffer.

Importantly, we also noted in Gateway that "absent the [cover] letter, the case would seem more like" Kidder v. Greenman, 187 N.E. 42 (Mass. 1933). Gateway, 297 F.2d at 486. In Kidder, a tenant had signed and returned a lease to her landlord with the understanding that the landlord would fill in certain blank spaces pursuant to an oral agreement. The landlord then completed the lease so as to include a term contrary to the oral understanding, signed it, and returned it to the tenant, who "did not look at the lease at the time she received it except to slit the envelope and see it contained a lease." Kidder, 187 N.E. at 45 (internal quotation marks omitted). The court declined to enforce the disputed term against the tenant on the ground that she "had no reason to think that the [landlord] had not completed the lease in the authorized manner and, therefore, [had] no occasion to examine it, when it was returned to her, to see if he had done so." Id. at 48. The Kidder court concluded that "[i]n these circumstances the doctrine that a person who accepts an instrument . . . without reading it . . . is charged with knowledge of [its] contents is not applicable." Id. (citations omitted).

We distill from the <u>Restatement</u> and the <u>Gateway</u> and <u>Kidder</u> precedents the legal rule in Massachusetts that silence in response to an offer may constitute an acceptance if an offeree who takes the benefit of offered services knew or had reason to know of the existence of the offer, and had a reasonable opportunity to reject it. <u>See</u> <u>Restatement (Second) of Contracts</u> § 69(1)(a); <u>Gateway</u>, 297 F.2d at 485-86; <u>Kidder</u>, 187 N.E. at 48. We turn now to the application of that rule in this case.

**IV.**

Under Federal Rule of Civil Procedure 56(c), a court may enter summary judgment if the record "show[s] that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." We review the district court's grant of summary judgment de novo, and examine the record in the light most favorable to the party against whom summary judgment had been entered, drawing all reasonable inferences in that party's favor. <u>Barreto-Rivera</u> v. <u>Medina-Vargas</u>, 168 F.3d 42, 45 (1st Cir. 1999). We note that "disputes about whether a contract has or has not been formed as the result of words and conduct over a period of time . . . present interpretive issues traditionally understood to be for the trier of fact." <u>Charbonnages de France</u> v. <u>Smith</u>, 597 F.2d 406, 414-15 (4th Cir. 1979). This is so unless "the manifestations of intention of both parties to be bound, or of either not to be bound, are so unequivocal as to present no genuine issue of fact." <u>Id.</u> at 415.

-10-

## A. The District Court's Opinion

In response to Bell's assertion that it did not notice McGurn's alteration of the offer letter until just before his termination, the district court observed that "absent fraud, a party to a contract is bound by the terms of the contract whether or not he read them." The court added: "It will not do for a man to enter into a contract, and, when called upon to respond to its obligations, to say that he did not read it when he signed it, or did not know what it contained." The district court's legal proposition is sound, but inapposite to this case. The disputed term was added to the offer <u>after Bell had signed it</u>. The relevant question is why, as a matter of law, Bell should be expected to <u>re-read</u> an offer it had written and signed, upon its return with McGurn's countersignature.

In response to that question, the district court declared that "[a] presumably sophisticated employer who receives a signed letter of engagement from a prospective employee and fails to read the letter, particularly after weeks of negotiation, does so at its own peril." Although the logic of this generalization has some appeal, its generality is an insurmountable problem. Unless the record establishes that Bell knew or had reason to know that McGurn had modified what Bell had written--and the district court points to no facts in the record that would support such a conclusion--we cannot say that Bell's silence, as a matter of law, constituted an acceptance of McGurn's counteroffer.

-11-

Although we decline to endorse the district court's generalization, "we may affirm [a summary judgment] order on any ground revealed by the record." Houlton Citizens' Coalition v. Town of Houlton, 175 F.3d 178, 184 (1st Cir. 1999). We therefore examine the record to see if, drawing all reasonable inferences in Bell's favor, the evidence nevertheless compels the conclusion that responsible officials at Bell knew or should have known about McGurn's counteroffer far enough in advance of his termination that Bell had a reasonable opportunity to reject the 24-month termination clause if it wished to avoid being bound. Summary judgment for McGurn would be proper if Bell had actual or constructive knowledge of McGurn's counteroffer at the time he returned the offer letter, or if, when Clark discovered the counteroffer, he had a "reasonable opportunity to reject" it before he fired McGurn, but instead continued to "take[] the benefit of [McGurn's] services" without speaking up. Restatement (Second) of Contracts § 69(1)(a).

There are three possible grounds for affirmance suggested by the record, two involving alleged actual knowledge and one involving constructive knowledge. We examine them in turn.

## B. Prominence of the Alteration

McGurn argues that Bell had actual knowledge of the alteration of the offer letter at the time of its return. Although McGurn advances no direct evidence that anyone at Bell noticed his revision of the termination clause, he points out that the alteration was made on the same page that bore his signature, which

-12-

Bell acknowledges an unknown employee checked pursuant to company policy. McGurn infers from this that the unknown employee "had to have seen the change" in the duration of the termination clause, because "one's eyes are immediately drawn to the change made by McGurn and his initials above that change."

While an inference that Bell "had to have seen the change" would be permissible based on the evidence in the record-- the alteration was in the center of the very page McGurn had signed--we cannot say that a factfinder would be required to conclude that the Bell employee who checked for McGurn's signature must have noticed McGurn's alteration of the termination clause half-way up the page. That is, the evidence that a Bell employee must have seen McGurn's alteration is not "so one-sided that [McGurn] must prevail as a matter of law." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252 (1986).

## C. Clark's Discovery

Clark declared that he examined the countersigned offer letter and discovered what McGurn had done "[a]t some point after making [the] decision [to terminate McGurn], but before the actual termination." The record only establishes that this discovery was made during or after April of 1998, and before McGurn was fired in August of 1998.[3] McGurn argues that once Bell discovered his

---

[3] In Bell's Statement of Material Facts, the timing of the discovery is characterized as follows: "McGurn's change . . . was not discovered until sometime during or after April, 1998, after . . . Brian Clark[] had determined that McGurn's performance was not satisfactory."

counteroffer it had an obligation to speak up if it wished to reject it. Bell points out, however, that Clark "could have discovered the altered document as late as the day before" he fired McGurn. Whatever the merits of McGurn's legal argument on this point--a matter as to which we take no view--this factual uncertainty precludes summary judgment for McGurn based on Clark's actual knowledge of McGurn's counteroffer.

## D. Teague's Responsibility

We also examine the record for evidence that Teague (Bell's Director of Human Resources), or an employee in her department acting on her behalf, should have determined if the returned offer letter had been modified. Teague had participated in the negotiations with McGurn. She stated at her deposition that "Bill Murphy and I worked together on all of these offer letters," and Donald Bell testified that he "consult[ed] with Linda [Teague]" during the drafting of the letter.[4] The July 3 offer letter from Bell to McGurn was signed by Teague, and indicated that McGurn should return the countersigned copy to her. Under these circumstances, a jury might conclude that McGurn could reasonably have expected Teague (or Murphy) to inspect the document upon its return. Moreover, the offer set out in Bell's letter was not a mere reduction to writing of a previous oral agreement; it was a step in a negotiation which Bell had no reason to assume had been

---

[4] The actual discussions (in person and via telephone) between Bell and McGurn were conducted by Bill Murphy and Donald Bell, not by Teague.

-14-

concluded. Although Teague requested that McGurn simply sign and return the letter unamended, the evidence supports the inference that she had no basis for assuming he would do so. Instead, she should have checked the document to ensure that he had not made further changes.

Although an inference that Teague should have examined the returned offer letter with greater care would be permissible based on the evidence in the record, the evidence, again, does not compel such an inference. Bell disputes the notion that Teague (or her subordinates) had any reason to check the returned offer letter for unauthorized modifications, and a factfinder might conclude that Teague had no reason to inspect the letter absent any indication from McGurn that he had revised a material term.[5]

We have stated that "[o]rdinarily the question of whether a contract has been made . . . is for the jury," Ismert & Assocs., Inc. v. New England Mut. Life Ins. Co., 801 F.2d 536, 541 (1st Cir. 1986), except where "[t]he words and actions that allegedly formed a contract [are] so clear themselves that reasonable people could

_____

[5] Because the July 3 offer letter was signed by Teague, and McGurn returned it to Teague (or Bill Murphy), we need not be detained by Bell's argument that the low-level employee who examined the returned letter lacked the authority to bind the corporation (with his silence) on the question of McGurn's termination clause. Teague having requested that McGurn return the letter to her, it would be no defense for her to say that a subordinate in her office who lacked the authority to bind the corporation opened the letter and failed to show it to her. See Gateway, 297 F.2d at 486 & n.4 (holding corporation responsible for contents of letter addressed to its president but read by a secretary). To accept Bell's argument on this point would be to penalize McGurn for Teague's failure to read her own mail. The same logic applies if McGurn returned the letter to Murphy, as he suggested he might have done.

not differ over their meaning," <u>Borque</u> v. <u>FDIC</u>, 42 F.3d 704, 708 (1st Cir. 1994) (internal quotation marks omitted). When, as is the case here, "the facts support plausible but conflicting inferences on a pivotal issue in the case, the judge may not choose between those inferences at the summary judgment stage." <u>Coyne</u> v. <u>Taber Partners I</u>, 53 F.3d 454, 460 (1st Cir. 1995); <u>accord</u> 10A Charles Allen Wright, Arthur R. Miller & Mary Kay Kane, <u>Federal Practice and Procedure</u> § 2725 at 433-37 (3d ed. 1998) ("[I]f the evidence presented on [a] motion [for summary judgment] is subject to conflicting interpretations, or reasonable people might differ as to its significance, summary judgment is improper.") (footnotes omitted).

**V.**

In sum, drawing all reasonable inferences in Bell's favor, as we must in reviewing the district court's entry of summary judgment against Bell, we cannot say that the facts in the record compel a conclusion that Bell noticed or should have noticed McGurn's modification of Bell's offer letter, and that its silence, therefore, constituted an acceptance of McGurn's offer. Instead, those issues must be resolved by the factfinder at a trial.

**Judgment vacated. Remanded for further proceedings consistent with this opinion. Each party to bear his or its own costs.**

**-- Separate Opinion Follows --**

-16-

**SELYA, Circuit Judge (dubitante).** I write separately because I doubt that the court's opinion reflects either the practicalities of the case at hand or the result that the Supreme Judicial Court (SJC) would reach.

The critical facts are undisputed. McGurn's counteroffer - the letter containing his modification of the termination clause - was received at Bell's headquarters in the ordinary course and routed by it to its human resources department. That letter formed the basis for the company's treatment of McGurn as an employee and remained part of the corporate personnel records for the duration of his employment. Given these facts, the case turns on whether Bell should be said to have accepted McGurn's counteroffer.

While no official of the company ever said "I accept" in so many words, acceptance can occur by silence under certain circumstances. See, e.g., Ismert & Assocs., Inc. v. New Engl. Mut. Life Ins. Co., 801 F.2d 536, 541-42 (1st Cir. 1986); Polaroid Corp. v. Rollins Envtl. Servs. (NJ), Inc., 624 N.E.2d 959, 964 (Mass. 1993); see also Restatement (Second) of Contracts § 69 (1981). One such set of circumstances, pertinent here, is when an offeree fails to reply to an offer yet takes the benefit of the offered services with reasonable opportunity to reject them and reason to know that they were tendered in the expectation of a particular consideration. See Restatement (Second) of Contracts § 69(1). In such a situation, it would be manifestly unjust for an offeree to reap the benefit of the services without letting the offeror know that it had no intention of paying the remuneration that the

-17-

offeror expected to receive.  Id., cmt. b.  Thus, fundamental fairness permits silence to operate as an acceptance.

This principle is part of the warp and woof of Massachusetts contract law.  See Polaroid, 624 N.E.2d at 964; Bump v. Robbins, 509 N.E.2d 12, 18-19 (Mass. App. Ct. 1987).  On the facts of record here, I think it likely that the SJC would find, as did the able district judge, that Bell implicitly assented to (and, therefore, should be bound by) the terms of McGurn's counteroffer.  After all, Bell unreservedly accepted McGurn's services, having reason to know from its own files that those services were being rendered with an expectation that the terms of the counteroffer (including the amended termination clause) would be fulfilled.[6]

To be sure, Bell tells us that, even though it employed McGurn for thirteen months pursuant to the letter that set out the terms of his counteroffer, no one in its employ noticed the modification.  But there is no hint here of chicanery on McGurn's part, and I doubt that ignorance induced by a party's own negligence or lassitude is a basis for escaping from contractual obligations.  To the contrary, the acceptance of offered services, under circumstances in which the beneficiary of those services ought to have known that the provider expected to be compensated

---

[6]Suppose the shoe was on the other foot, and McGurn's counteroffer had included not only an expanded termination clause but also a covenant not to compete.  Only an innocent would assume that Bell would refrain from attempting to enforce the covenant against McGurn.  To my mind, this example illustrates that the majority's resolution of the case lets Bell have its cake and eat it too.  I have no stomach for so one-sided a result - and I doubt that the SJC would find it appetizing.

for them in a certain way, is the functional equivalent of express assent.  See Bump, 509 N.E.2d at 18-19.  This case seems to fit within the contours of that rule.

To sum up, I believe that a party should not be able to insulate itself from ex contractu liability by professing that it neglected to read the very document essential for the formation of the contract, especially when that document has reposed in its own files at all relevant times.  Were the law otherwise and the majority's view taken to its logical extreme, an offeree could completely redefine its responsibilities by the simple expedient of claiming that it was not aware of what its own records plainly showed.  I doubt that the SJC would countenance so counterintuitive a result.  Cf. Upton v. Tribilcock, 91 U.S. 45, 50 (1875) (observing that "[i]t will not do for a man to enter into a contract, and, when called upon to respond to its obligations, to say that he did not . . . know what it contained.  If this were permitted, contracts would not be worth the paper on which they are written").  Given this doubt, I respectfully decline to join the court's opinion.