MARK CASAVANT & another[1] *vs.* NORWEGIAN CRUISE LINE, LTD.

No. 04-P-47.

Worcester. September 9, 2004. - June 30, 2005.

Present: LAURENCE, BROWN, & BERRY, JJ.

*Conflict of Laws. Practice, Civil,* Motion to dismiss, Choice of forum, Summary judgment. *Contract,* Choice of forum clause, Offer and acceptance. *Admiralty.*

In a civil action brought in a Massachusetts court by plaintiffs against the defendant cruise line, seeking to recover a refund of payments made to the defendant for a cruise, the trial judge erred in granting summary judgment in favor of the defendant on the ground that a forum selection clause set forth in the ticketing contract required that the litigation be filed in Florida, where the judgment was allowed without providing the plaintiffs an opportunity to respond to the defendant's motion, as required by Mass.R. Civ.P. 56 [789-792]; where the manner and means of the delivery of the terms of the ticketing contract did not fairly allow the plaintiffs the opportunity to reject the contract with impunity, as required by Federal maritime law [792-797]; and where that contract's forum selection clause was not enforceable under controlling Massachusetts contractual law, as the plaintiffs could not be deemed impliedly to have accepted the contract in the limited time frame allowed [797-799].

CIVIL ACTION commenced in the Superior Court Department on October 3, 2002.

The case was heard by *James P. Donohue,* J., on motions for summary judgment.

*John D. Deacon, Jr.,* for the plaintiffs.

*Barbara P. Lazaris* for the defendant.

BERRY, J. The plaintiffs, Mark and Tara Casavant, appeal from the dismissal of their complaint against the defendant, Norwegian Cruise Line, Ltd. (Norwegian), which sought to recover payment for a cruise scheduled to depart from Boston

---

[1]Tara Casavant.

on September 16, 2001. In the aftermath of the September 11, 2001, terrorist hijacking of airplanes that originated from Boston's Logan Airport and smashed into and destroyed the twin towers at the World Trade Center in New York City, killing nearly 3,000 people, the Casavants were fearful of going on the cruise,[2] which was to embark from Boston Harbor.

1. *Background.* According to the verified complaint, in September, 2001, approximately a week after receiving the ticketing contract, the Casavants communicated with Norwegian "to inform [Norwegian] that they were unwilling to proceed with the September 16 voyage, and to request rescheduling of their cruise to a later date." Three additional such requests were transmitted by the Casavants. All were denied by Norwegian. The Casavants then followed with a letter dated September 17, 2001, in which they reiterated their trepidations.

> "The fact that Massport has responsibility for security at the Black Falcon Pier and Logan Airport in Boston contributed to our trepidation. After all, this was the place where two of the hijacked planes originated with sixteen terrorists aboard. As events continued to unfold it became apparent that security had been lax for some time. It also

---

[2]The Casavants' concerns were not idiosyncratic. Reverberations from the September 11 attack on cruise ship bookings were recognized in law articles concerning maritime law. See, e.g., Dickerson, The Cruise Passenger's Dilemma: Twenty-First-Century Ships, Nineteenth-Century Rights, 28 Tul. Mar. L.J. 447, 454-455 (2004) ("On September 11, 2001 four regularly scheduled domestic commercial aircraft were hijacked by terrorists. Two of the aircraft were flown into both towers of the World Trade Center in New York City resulting in their collapse. A third hijacked aircraft was flown into the Pentagon in Washington, D.C. A fourth aircraft crashed into a field near Pittsburgh. The total number of dead was nearly 3,000. The ease with which the hijackers boarded the aircraft and seized control with knives and box cutters highlighted just how vulnerable our airports and commercial aircraft are to terrorist acts. This horrific disaster has and will continue to generate significant changes in passenger security at airports and on aircraft and on other forms of mass transportation such as cruise ships"). See also *id.* at 455 n.56, quoting from McDowell, Security is Tightened on Ships and at Ports, N.Y. Times, Dec. 9, 2001, at 3 ("But since Sept. 11, security has been ramped up at ports and on cruise ships and other vessels to its highest level since World War II. The Coast Guard, which oversees maritime security, added uniformed armed 'sea marshals' to cruise ships in October and Coast Guard cutters equipped with machine guns often escort cruise and cargo ships to and from port").

became evident that Boston was identified by the terrorists as a prime target. This became more clear with the bomb scare in Boston Harbor on Sunday September 16, 2001."

Norwegian responded by letter dated October 11, 2001, refusing "to honor your request for a refund or credit" and taking the position that passengers should obtain travel insurance "to cover unforseen circumstances."

The Casavants commenced this litigation. In addition to its answer and counterclaim,[3] Norwegian filed a motion to dismiss the complaint based on a forum selection clause set forth in the ticketing contract, which required that litigation be filed in Florida. Judgment entered dismissing the complaint based on this forum selection clause.

The record reflects that Norwegian had not provided information concerning the forum selection clause — or for that matter, the contractual terms and conditions, including limitations on Norwegian's liability — until close to one year after the original booking, two months after full payment of the $2,017.50 cruise price, and approximately thirteen days before the sail date.[4] The first time the purported contractual terms were forwarded to the

---

[3]The Norwegian counterclaim was based on a letter by Norwegian's lawyer, which stated the lawyer's position that the Casavants "had more than adequate opportunity to review its [the ticketing contract's] terms and conditions and to object to its contents." Predicated only on this letter expressing the corporate lawyer's post-commencement of litigation views — to the favor of his client — the counterclaim boldly asserted that, because of "the subject Passenger Ticket Contract, Plaintiffs vexatiously commenced litigation in the Commonwealth in direct violation of the Dade County, Florida forum selection clause in the Passenger Ticket Contract for which defendant [Norwegian] demands counsel fees, costs and disbursements as allowable by law in defense of this action."

[4]The record reflects the following chronology concerning the Casavants' booking, payment, and receipt of the ticketing contract. In October, 2000, the Casavants booked a Boston to Bermuda round-trip cruise at a travel agency operating within the discount warehouse store, BJ's. The scheduled departure date was September 16, 2001. The total price for the two tickets was $2,145.50. At this initial booking in October, 2000, the Casavants paid a deposit of $628 and thereafter tendered additional payments, so that, prior to July 18, 2001, the balance was paid in full. As noted above, Norwegian did not provide the Casavants information concerning the essential terms of the contract for passage until the early September, 2001, submission of the ticketing documentation. (Norwegian admits it mailed the ticket on August 27, and that the Casavants received the document approximately one week later.)

Casavants was in a document entitled "passenger ticket contract," which document was received by the Casavants in September, 2001. The contractual terms are set forth in two pages of fine print in the ticketing document.[5] A box on the first page states that: "Acceptance of this Passenger Ticket Contract by Passenger shall constitute the agreement of Passenger to these Terms and Conditions."[6] The forum selection clause appears in par. 28 on the second page of the ticketing contract.[7]

Because the manner and means of the delivery of the terms of the contract for passage did not fairly allow the Casavants "the option of rejecting the contract with impunity," *Carnival*

---

[5] In pertinent part, par. 1 of the ticketing contract stated as follows:

"All the terms and provisions of all sides of this Contract, including all of the following matter printed below, are a part of this Contract to which the passenger and/or purchaser, both on his/her behalf and on behalf of any other person or persons, including children, for whom this ticket is purchased, acknowledge and agree to be bound thereby by accepting this Contract or transportation from the Carrier."

[6] Another contractual term limited Norwegian's liability for "terrorist actions or threats [and] hijacking" — an active point in light of the Casavants' fear.

"The passenger admits a full understanding of the nature and character of the vessel and assumes all risks of travel, transportation and handling of passengers and baggage. The passenger assumes the risk of, and agrees that the Carrier and the vessel shall not be liable for (a) injury, death, or delay of or to the passenger; or (b) loss, damage or delay to the passenger's baggage, personal effects, or property arising from, caused by or in the judgment of the Carrier or Master rendered necessary or advisable by reason of any act of God or public enemies, arrest, restraints of princes, rulers of people, piracy, war, revolution, extortion, terrorist actions or threats, hijacking, bombing, threatened or actual rebellion, insurrection, civil strife, fire. . . ."

[7] The forum selection clause in the ticketing contract document provides as follows:

"This Contract shall be governed in all respects by the laws of the State of Florida and the laws of the United States of America. It is hereby agreed that any and all claims, disputes or controversies whatsoever arising from or in connection with this Contract and the transportation furnished hereunder shall be commenced, filed and litigated, if at all, before a court of proper jurisdiction located in Dade County, Florida, U.S.A."

*Cruise Lines, Inc.* v. *Shute*, 499 U.S. 585, 595 (1991), and because, in the limited time frame allotted, the Casavants did not accept the ticket as a binding contract, under controlling Federal maritime law and Massachusetts contractual law, the Florida-dictated forum selection clause is not enforceable. Suit may therefore proceed in the Massachusetts courts. Accordingly, we reverse the judgment.

2. *Procedural error in the allowance of Norwegian's motion.* Apart from the substantive error of law concerning whether there existed a binding contract so that the forum selection clause was operative — an issue we address in part 4, *infra* — there was also a fundamental error in the Superior Court's judgment dismissing the complaint: that is, the allowance of judgment *without* providing the Casavants an opportunity to respond to Norwegian's motion. The procedural background underlying this error is as follows.

On November 18, 2002, citing the forum selection clause, Norwegian served upon the Casavants' counsel a motion seeking dismissal of the Massachusetts action, accompanied by the affidavit of one Jane E. Kilgour, the manager of Norwegian's passenger and crew claims department. The motion was a "speaking" motion, also serving as a memorandum of law and setting forth legal argument, case law citations, and the reasons why Norwegian contended that judgment should enter enforcing the forum selection clause, based on the averments in the Kilgour affidavit.

At the outset, we note that such a motion, predicated upon enforcement of a forum selection clause that would have placed venue exclusively in Florida, in legal effect seeks not a venue change to such other forum. Rather, such a motion is, in legal effect, a motion to dismiss for failure to state a claim assertable within the State of filing based on contractual limitations allegedly agreed to by the parties. Accordingly, such a motion is properly pleaded under Mass.R.Civ.P. 12(b)(6), 365 Mass. 755 (1974). This is consistent with Federal practice wherein Fed.R. Civ.P. 12(b)(6) is the operative procedural rule for dismissal motions predicated on forum selection clauses. See, e.g., *LFC Lessors, Inc.* v. *Pacific Sewer Maintenance Corp.*, 739 F.2d 4, 6-7 (1st Cir. 1984) (motion to dismiss based on forum selection

clause was not one predicated upon jurisdiction or venue, but instead sought to enforce contractual stipulation; therefore, motion should have been brought under Fed.R.Civ.P. 12[b][6], rather than under Fed.R.Civ.P. Rules 12[b][1] and 12[b][3]). Accord *Doe* v. *Seacamp Assn.*, 276 F. Supp. 2d 222, 224 n.2 (D. Mass. 2003).

Motion practice under our Massachusetts rules of civil procedure tracks the Federal rules. *Rollins Envtl. Servs., Inc.* v. *Superior Ct.*, 368 Mass. 174, 179-180 (1975). In addition, the Supreme Judicial Court has adopted the Federal approach in judicial review of forum selection clauses, as "involv[ing] neither venue nor jurisdiction in the traditional sense." *Jacobson* v. *Mailboxes Etc. U.S.A., Inc.*, 419 Mass. 572, 576 n.6 (1995). For these reasons, we believe that, in accord with Federal procedural practice and our State motion practice, Mass. R.Civ.P. 12(b)(6)[8] governs when a party seeks to enforce a forum selection clause. This is particularly apt in cases involving forum selection clauses subject to Federal maritime law because, as shall be discussed *infra*, Federal maritime law controls with respect to resolution of legal issues for which there are governing Federal law pronouncements.

Although Mass.R.Civ.P. 12(b)(6) was the pertinent procedural mechanism in this case, Norwegian's motion went beyond the confines of that rule. Given Norwegian's extra-complaint submissions, the dismissal motion should have been treated as a motion for summary judgment. See note 10, *infra*. In timely response thereto, on December 6, 2002, the Casavants served an opposition and a cross motion for summary judgment. This is consistent with the twenty-one day time frame set forth in Rule 9A(a)(2)(B) of the Superior Court Rules (1999). However, on December 3, 2002, three days before receipt of the Casavants' summary judgment opposition, and in violation of rule 9A(b)(2), Norwegian filed its moving papers directly with the Superior Court. To neutralize the error in Norwegian's unilateral filing, the Casavants, in turn, on December 9, mailed their opposition to the Superior Court, which opposition was received in that court on December 10, 2002. However, on December 9, 2002, the day before receipt of the Casavants' opposition and

---

[8]As in this case, the rule 12(b)(6) motion may be converted to one for summary judgment under Mass.R.Civ.P. 56, 365 Mass. 824 (1974). See *infra*.

based on the one-sided filings of Norwegian, the Superior Court judge entered an order dismissing the Casavants' complaint.[9] The dismissal relied on the extra-complaint materials that were incorporated in the Norwegian memorandum of law.

Because the Norwegian motion filing included extra-complaint materials concerning the forum selection clause, and because the judge relied on these supplemental extra-complaint filings in entering dismissal, the ultimate dismissal was, in law, a summary judgment. That being so, the provisions of Mass.R. Civ.P. 56, 365 Mass. 824 (1974), should have been followed. See Mass.R.Civ.P. 12(b).[10] They were not, and this fundamental

---

[9]Norwegian's brief is misleading and disingenuous in its description of when the dismissal entered. The docket records the judge's ruling allowing the dismissal motion as having entered on December 9, 2002. However, the Norwegian appellate brief represents as follows:

> "However, the Docket Entries record that the Casavants' opposition and objection to [Norwegian's] motion to dismiss were filed with the court below on December 10, 2002. . . . Two days later on December 12, 2002, after due deliberation on this modest claim, the lower court issued the Clerk's Notice stating that the motion to dismiss was allowed. . . . Judgment was entered the following day. . . . Therefore, the court below had adequate opportunity to consider the Casavants' substantive arguments before rejecting them."

The description set forth above is nothing more, nor less, than a misdirected effort designed to suggest to this court that the judge acted on the motion only after reviewing the Casavants' opposition. First, the clerk's notice (which serves as the form of mailing notice to counsel of court entries) cites "the Court's action on 12/09/2002," dismissing the action "for the reasons set forth in the defendant's memorandum." Second, in the unlikely event that counsel's eye missed this date in reviewing the clerk's notice, at the time of filing its appellate brief to this court, Norwegian's counsel full well could see the docket included in the record appendix, which confirms the December 9 entry date for the judge's dismissal. We need not say more about this kind of "advocacy."

[10]It is provided in Mass.R.Civ.P. 12(b) that the opposing party shall be given the opportunity to respond if the dismissal motion rests on supplemental materials beyond the original complaint pleadings:

> "If, on any motion asserting the defense numbered (6), to dismiss for failure of the pleading to state a claim upon which relief can be granted, matters outside the pleading are presented to and not excluded by the court, *the motion shall be treated as one for summary judgment and disposed of as provided in Rule 56, and all parties shall be given reasonable opportunity to present all material made pertinent to such a motion by Rule 56*" (emphasis added).

procedural error undermines the stability of the judgment. See *Central Contr. Co.* v. *Maryland Cas. Co.*, 367 F.2d 341, 343 (3d Cir. 1966) (motion to dismiss based on forum selection clause, which was accompanied by parties' affidavits, would be considered by reviewing court as one for summary judgment). Compare *Paredes* v. *Princess Cruises, Inc.*, 1 F. Supp. 2d 87, 89 (D. Mass. 1998) (under Fed.R.Civ.P. 12[b][6], cruise line's motion to dismiss based on shortened limitations period in passenger ticket contract treated as one for summary judgment because judge considered matters outside pleadings).[11]

We do not rest our decision reversing the judgment on this procedural error alone. For, in addition to the procedural flaw involving the manner in which the Norwegian motion was unilaterally presented to, and ruled on, by the lower court, there was substantive error of law with respect to the lower court's truncated analysis of Federal maritime law and State contractual law as affecting the enforceability of the forum selection clause. Among other substantive law errors, there was no judicial analysis of the pivotal Federal maritime law issues and the issue of law concerning whether the passenger ticketing document was under State law an enforceable contract in the first place. Instead, in relying exclusively on the arguments in the Norwegian memorandum and affidavit, the motion judge accepted the proposition that, simply because a forum selection clause appeared in the passenger ticket, a lawsuit was barred in Massachusetts and the complaint was subject to dismissal. This is incorrect, and we turn, then, to this substantive error of law, which renders the judgment reversible.

3. *Standard of review.* Treating the judge's decision as an award of summary judgment, and consistent with Federal practice in the realm of maritime forum selection clauses, we review de novo to determine whether there exist genuine issues of material fact and whether, based on the forum selection clause, Norwegian was entitled to dismissal of the Casavants'

[11]Seeking to bring to the Superior Court judge's attention that their opposition was not considered before entry of the dismissal, the Casavants filed for reconsideration or, in the alternative, relief from the judgment. See Mass.R. Civ.P. 60(b), 365 Mass. 828 (1974). For reasons not stated in the record, this motion was denied.

complaint. See, e.g., *Jimenez* v. *Peninsular & Oriental Steam Nav. Co.*, 974 F.2d 221, 222 (1st Cir. 1992) (de novo review of summary judgment based on shorter limitations period in passenger ticket); *Silva* v. *Encyclopedia Britannica, Inc.*, 239 F.3d 385, 387 (1st Cir. 2001) (de novo review of dismissal based on forum selection clause in employment contract).

4. *The intersections between Federal maritime law and Massachusetts contract law.* It has long been held that legal issues involving a passenger ticket contract for a cruise, which is a maritime contract, present matters arising in admiralty, as to which Federal maritime law preempts and controls. See *Jansson* v. *Swedish Am. Line*, 185 F.2d 212, 216 (1st Cir. 1950) (whether filed in State or Federal court, litigation involving cruise passenger ticket contract presents matters of maritime law, "of which the ultimate expositor is the Supreme Court of the United States"); *Jimenez* v. *Peninsular & Oriental Steam Nav. Co.*, 974 F.2d at 223 n.4. See also *Milanovich* v. *Costa Crociere, S.P.A*, 954 F.2d 763, 766 (D.C. Cir. 1992); *Gibbs* v. *Carnival Cruise Lines*, 314 F.3d 125, 132 (3d Cir. 2002); *Vavoules* v. *Kloster Cruise Ltd.*, 822 F. Supp. 979, 982-983 (E.D.N.Y. 1993), and cases cited.

However, in these admiralty-based matters, while Federal maritime law is the force which controls the tides within shipping and cruise lanes, there are certain substantive law currents into which Federal law has not flowed and does not chart the legal course. In these non-Federal law currents, State law applies. Put another way, where Federal maritime law is silent on a particular substantive law issue, State substantive law applies. See *Wilburn Boat Co.* v. *Fireman's Fund Ins. Co.*, 348 U.S. 310, 313 (1955) (much regulatory power in field of maritime contracts has been left to States); *Ellenwood* v. *Exxon Shipping Co.*, 984 F.2d 1270, 1279 (1st Cir. 1993); *Windsor Mount Joy Mut. Ins. Co.* v. *Giragosian*, 57 F.3d 50, 54 (1st Cir. 1995). See also *Jimenez* v. *Peninsular & Oriental Steam Nav. Co.*, 974 F.2d at 223 (applying State law to interpretation of maritime contract's terms).

We first address the preemptive and supremacy based principles of developed Federal maritime law, which control forum selection clauses affecting cruises, such as in this case.

We then consider that part of the legal tidelands where Federal law has ebbed and into which flows State contract law concerning what constitutes acceptance of a contract, here, the issue being whether the Casavants accepted the ticketing contract within which the forum selection clause appears.

a. *Federal maritime law concerning forum selection clauses in shipping contracts.* In *The Bremen* v. *Zapata Off-Shore Co.,* 407 U.S. 1 (1972) (*The Bremen*), the United States Supreme Court considered the enforceability of forum selection clauses in commercial maritime contracts. The Court held that, as matter of Federal law, such forum selection clauses in business maritime contracts will be given effect so long as the clause is "unaffected by fraud, undue influence, or overweening bargaining power," *id.* at 12, and enforcement of the clause would not be "unreasonable and unjust." *Id.* at 15. Our Supreme Judicial Court adopted the *The Bremen* analysis in *Jacobson* v. *Mailboxes Etc. U.S.A., Inc.,* 419 Mass. 572 (1995), and changed Massachusetts law, holding that "forum selection clauses are valid and enforceable, *except when it is shown that enforcement would be unreasonable*" (emphasis supplied). *Id.* at 574.[12] In doing so, the Supreme Judicial Court "accept[ed] the modern view that forum selection clauses are to be enforced *if it is fair and reasonable to do so*" (emphasis supplied). *Id.* at 574-575. Accord Restatement (Second) of Conflict of Laws § 80 (rev. ed. 1988) ("The parties' agreement as to the place of the action will be given effect unless it is unfair or unreasonable"), quoted in *Jacobson* v. *Mailboxes Etc. U.S.A., Inc.,* 419 Mass. at 575.

In its analysis of the enforceability of such a clause in the commercial maritime context, the Supreme Court, in *The Bremen*, observed that what was at issue was a maritime shipping contract between businesses, each of which possessed bargaining power exercisable in negotiations that ultimately would set the material points of the maritime transport contract. There

---

[12]The Supreme Judicial Court's adoption of the *The Bremen* doctrine concerning forum selection clauses was not limited to maritime contracts, the context in which *The Bremen* was decided. Rather, the court's analysis was broader and accepted the validity of forum selection clauses if fair and reasonable in all contexts. For example, the *Jacobson* case forum selection clause appeared in a franchising agreement. *Jacobson* v. *Mailboxes Etc. U.S.A., Inc.,* 419 Mass. at 573.

was, according to the Court, "strong evidence that the forum clause was a vital part of the agreement . . . it would be unrealistic to think that the parties did not conduct their negotiations, including fixing the monetary terms, with the consequences of the forum clause figuring prominently in their calculations" (footnote omitted). *The Bremen*, 407 U.S. at 14.

In contrast to business-to-business deals, in private passenger maritime cruise contracts, the bargaining power of the passenger vis-à-vis the commercial cruise line is de minimis, differing greatly from that of dueling business entities engaged in negotiating the terms for commercial maritime shipping, such as were at issue in *The Bremen*. This disparity between commercial shipping contracts and private cruise ticketing contracts with forum selection clauses was, post *The Bremen*, considered by the Supreme Court in *Carnival Cruise Lines, Inc.* v. *Shute*, 499 U.S. 585, 593-595 (1991) (*Carnival Cruise*), wherein the Court likened the forum selection clause in a private cruise contract to a contract of adhesion. "[I]t would be entirely unreasonable for us to assume that respondents — or any other cruise passenger — would negotiate with petitioner the terms of a forum-selection clause in an ordinary commercial cruise ticket." *Id.* at 593. Accordingly, in connection with the enforceability of forum selection clauses in private cruise tickets, the Court acknowledged the necessity for some refinement of *The Bremen* analysis "to account for the realities of form passage contracts." *Ibid.*

Among the judicial refinements crafted by the Court in the private cruise context was the imposition of a heightened judicial standard of review, with "emphasis that forum-selection clauses contained in form passage contracts are subject to judicial scrutiny *for fundamental fairness*" (emphasis supplied). *Id.* at 595. In addition, beyond *The Bremen's* commercial requirements that a forum selection clause must be "unaffected by fraud, undue influence, or overweening bargaining power," 407 U.S. at 12, in *Carnival Cruise*, the Court weighed whether the cruise ticketing contract, with the embedded forum selection clause, was reasonably and timely communicated to the passenger, so as to yield sufficient notice, giving the passenger the

opportunity to "reject[] the contract with impunity."[13,14] 499 U.S. at 595.

In the wake of *Carnival Cruise*, the Federal courts have decided a number of cases which establish that, for vacation cruise ticketing contracts, in order for the passenger to be bound by the forum selection clause under Federal maritime law, the private ticket cruise buyer must be given reasonable time within which to act and to reject the ticketing contract and forum selection clause, without incurring disproportionately unfair penalties for such a rejection.[15]

The "refined" standards in *Carnival Cruise*, applicable to a private cruise ticketing contract, as matter of Federal maritime law — i.e., timely delivery to yield sufficient notice, with a corresponding opportunity for the passenger to reject the ticketing contract and forum selection clause with impunity — were not

---

[13]The majority of the Court reasoned that such notice was conceded to have been provided in the circumstances presented and, hence, the majority found the forum selection clause enforceable. *Carnival Cruise*, 499 U.S. at 595. Two dissenting justices were not so persuaded and had deeper concerns, writing that "only the most meticulous passenger is likely to become aware of the forum-selection provision," and that "[t]hese clauses are typically the product of disparate bargaining power between the carrier and the passenger," *id.* at 597 (Stevens, J., dissenting) — a point as addressed above, which was shared by the majority in the Court's ultimate decision. Further, the dissenting opinion concludes that "[e]ven if passengers received prominent notice of the forum-selection clause before they committed the cost of the cruise, [the dissenting judges] would remain persuaded that the clause was unenforceable under traditional principles of federal admiralty law and is 'null and void' under the terms of Limitation of Vessel Owner's Liability Act, ch. 521, 49 Stat. 1480, 46 U.S.C. App. § 183c, which was enacted in 1936 to invalidate expressly stipulations limiting shipowners' liability for negligence." *Id.* at 598.

[14]Although Federal maritime law controls, we note that the refinements crafted in *Carnival Cruise* comport with State law set forth in the Supreme Judicial Court's decision in *Jacobson* that a forum selection clause will be enforced only "if it is fair and reasonable to do so." *Jacobson* v. *Mailboxes Etc. U.S.A., Inc.*, 419 Mass. at 573.

[15]The United States Court of Appeals for the First Circuit has applied a two-prong test, *Shankles* v. *Costa Armatori, S.P.A.*, 722 F.2d 861, 864-866 (1st Cir. 1983), to determine whether the forum selection clause was reasonably communicated to the passengers such that enforcement was fair. First, the ticket itself is examined for facial clarity; second, the circumstances attending the passenger's purchase, and opportunity to become familiar with the ticket and its terms, are considered. Cf. *Lousararian* v. *Royal Caribbean Corp.*, 951 F.2d 7, 10-12 (1st Cir. 1991) (applying two-prong test to determine reasonableness of cruise line's effort to alert passengers to shorter limitations period in passenger ticket contract).

met in this case. As previously noted, the record reflects the Casavants received the passenger ticket contract on or about September 3, 2001, some thirteen days before the scheduled departure date of September 16, 2001. Although Norwegian averred in an affidavit, see note 19, *infra*, that passengers could cancel their cruises without penalty, when the Casavants sought to have Norwegian reschedule or refund the cruise price after the September 11 terrorist attack — an expeditious request by the Casavants in light of the limited time that the ticketing contract was in their possession and the blackout of any prior information — rather than being afforded the opportunity to reject the contract with impunity, the Casavants were subjected to punitive measures.

b. *State law and the Norwegian implied acceptance theories.* Norwegian seeks to distance itself from the potential invalidity of the forum selection clause under Federal law by arguing that the Casavants knowingly accepted the ticketing contract, creating a binding agreement. We turn now to Norwegian's arguments that the Casavants should be deemed impliedly to have accepted the passenger ticket contract, thereby giving a binding effect to the forum selection clause. These claims of implied contract acceptance are to be reviewed under Massachusetts law, since Federal maritime law is silent and has not occupied the field.[16] See part 4, *supra*.

" '[O]rdinarily, the question of whether a contract has been

---

[16]The Casavants argue that, because Federal maritime law is silent, Massachusetts law controls the question whether the ticketing contract was accepted, such that there was a binding agreement. This issue of contract formation differs from general interstitial construction of an indisputably binding contract. The Massachusetts connections with respect to choice of law in analyzing this contract formation issue are many: the Casavants are Massachusetts citizens, they purchased the cruise tickets in Massachusetts, the ship was to sail from and return to a Massachusetts port, the alleged reasons for the Casavants' cancellation arose from their concerns about terrorist activities originating from Massachusetts transportation facilities, and the Casavants filed suit in Massachusetts and sought to enforce, among other things, the Massachusetts consumer protection statute, G. L. c. 93A. See generally *Bushkin Assocs.* v. *Raytheon Co.*, 393 Mass. 622, 632 (1985); *Hodas* v. *Morin*, 442 Mass. 544, 549 (2004). Norwegian did not dispute application of Massachusetts law, notwithstanding that the forum selection clause provided that the contract would be governed by Florida law. Cf. *Muratore* v. *M/S Scotia Prince*, 845 F.2d 347, 352 n.3 (1st Cir. 1988) (in suit brought in

made . . . is for the jury,' except where 'the words and actions that allegedly formed the contract [are] so clear themselves that reasonable people could not differ over their meaning' " (citations omitted). *McGurn* v. *Bell Microprods., Inc.*, 284 F.3d 86, 93 (1st Cir. 2002) (applying Massachusetts law). See *David J. Tierney, Jr., Inc.* v. *T. Wellington Carpets, Inc.*, 8 Mass. App. Ct. 237, 239 (1979). We do not see in "the words and actions" of the Casavants reflection of such acceptance as Norwegian advances. See generally *I&R Mechanical, Inc.* v. *Hazelton Mfg. Co.*, 62 Mass. App. Ct. 452, 455 (2004), citing Restatement (Second) of Contracts § 50(1) (1981) ("[a]n offer ripens into a binding contract when it is accepted").

First, Norwegian argues that the Casavants are presumed to have accepted the contractual terms because of the Casavants' initial silence upon receipt of the ticketing contract. We reject this presumption. "Acceptance by silence is exceptional." Restatement (Second) of Contracts § 69 comment a. See *McGurn* v. *Bell Microprods., Inc.*, 284 F.3d at 90 ("[A]s a general rule, silence in response to an offer to enter into a contract does not constitute an acceptance of the offer"). Norwegian also argues that the Casavants must be deemed to have accepted the ticketing contract by failing to voice particularized objection to specific terms and conditions. The argument is unavailing and, indeed, borders on the ephemeral — the Casavants' repeated requests to reschedule the cruise and their reasons set forth in the September 17 letter were sufficient objection.[17]

In this respect, the *Carnival Cruise* standard of judicial scrutiny for fundamental fairness confirms our view of the un-

Federal District Court in Maine, and where forum selection not at issue, Maine law applied to supplement maritime law where no objection from parties).

[17]The cruise ship tort cases upon which Norwegian relies for per se enforcement of forum selection clauses are distinguishable. These cases, in the main, involve passengers who received their tickets prior to the scheduled cruise and, notwithstanding reasonable opportunity to reject the contract, embarked on the cruise, thereby taking the contractual benefit. Restatement (Second) of Contracts § 69(1)(a). See generally *McGurn* v. *Bell Microprods., Inc.*, 284 F.3d at 91 ("legal rule in Massachusetts [is] that silence in response to an offer may constitute an acceptance if an offeree who takes the benefit of offered services knew or had reason to know of the existence of the offer, and had a reasonable opportunity to reject it"). The Casavants did not avail themselves of the service offered.

enforceability of this clause where the course of conduct of Norwegian was unreasonable and unjust. Here the ticket purchasers took no affirmative action to accept the contract, but rather expressly rejected the services offered in the contract due to legitimate safety concerns stemming from the catastrophic events of September 11, 2001. In these circumstances, as there was not, under Federal maritime law, the allowance of an opportunity for the Casavants to reject the ticketing contract "with impunity," nor, under State contract law, did the Casavants' actions give rise to an accepted contract, we conclude that the forum selection clause is unenforceable.[18] See generally *Rams* v. *Royal Caribbean Cruise Lines, Inc.*, 17 F.3d 11, 12 (1st Cir. 1994) (fact that contract under review was maritime contract did not "change the ordinary strictures governing [appellate court's] plenary review of the meaning of a written contract"). Accordingly, judgment for Norwegian should not have entered.

5. *Open issues.* Whether their rejection of the passenger ticket contract entitled the Casavants to a full refund of the ticket price under Norwegian's own policy is a matter for the fact finder at trial. Assuming the facts to be as the Casavants allege, a fact finder may decide that the Casavants are entitled to a full refund under Norwegian's policy, which policy was first disclosed in the Kilgour affidavit attached to Norwegian's motion to dismiss — albeit not honored in this case. According to this Norwegian affidavit,[19] the policy is to refund fully the ticket price, if rejection precedes the beginning of the voyage. Compare *Lurie* v. *Norwegian Cruise Lines, Ltd.*, 305 F. Supp. 2d 352, 358 (S.D.N.Y. 2004).

Also remaining for trial is the Casavants' claim against

---

[18]The same result would obtain if we were to review the issue pursuant to Mass.R.Civ.P. 60(b). See note 11, *supra*; *Pielech* v. *Massasoit Greyhound, Inc.*, 47 Mass. App. Ct. 322, 325 (1999), and cases cited.

[19]In the affidavit, Kilgour states, inter alia:

"At all times relevant, it was, and remains, the policy of [Norwegian] to refund in full the fare paid by a passenger, without penalty, if that passenger wishes to cancel a cruise because of an objection to a provision contained in the Contract of Passage before the cruise in question begins."

Norwegian for unfair or deceptive practices, pursuant to G. L. c. 93A. Although this is a maritime case, the "savings clause" of 28 U.S.C. § 1333 (2004) preserves State law remedies that do not contravene maritime law.[20] See *Ballard Shipping Co.* v. *Beach Shellfish*, 32 F.3d 623, 626 (1st Cir. 1994). We discern no contravention to established maritime law on the legal issue whether Norwegian may have violated G. L. c. 93A.

*Judgment reversed.*

*Order denying motion for reconsideration vacated.*

BROWN, J. (concurring). The panel became aware at oral argument (and made it known) of the situation that was causing Norwegian's counsel much "embarrassment." (See note 9, majority opinion, *ante*.) Notwithstanding the court's suggestion that counsel would be well advised to attempt to settle this matter amicably, rather than pursue it further in the courts, no post-appellate action was sought or even requested (as far as can be discerned from the record). Cf. *Liberty Mut. Ins. Co.* v. *Nippon Sanso K.K.*, 331 F.3d 153, 163 (1st Cir. 2003) (Boudin, C.J.) ("This case is about money, but only money, and should have been settled . . ."). Thus, Norwegian's counsel would have been well advised to adhere to the following admonition: "Litigation should be a last resort, not the first option." *Petricca Constr. Co.* v. *Commonwealth*, 37 Mass. App. Ct. 392, 402 (1994) (Brown J., concurring). "Rational thought and wise counseling are available at far less expense[.]"[1] *Ibid.* And, I might add, much less professional embarrassment.

---

[20] "The modern version of the statute saves 'all other remedies to which [suitors] are otherwise entitled.' 28 U.S.C. § 1333. The upshot is that an injured party may have claims arising from a single accident both under federal maritime law and under state law, whether legislation or common law." *Ballard Shipping Co.* v. *Beach Shellfish*, 32 F.3d 623, 626 (1st Cir. 1994).

[1] This is not a new concern, for one need only look to the timeless words of Chief Justice Stone, given in an address in 1934, exhorting members of the bar to honor their overarching duties as officers of the court in the course of their representation of business entities. Stone, The Public Influence of the Bar, 48 Harv. L. Rev. 1 (1934).